## Gonzales DIGGS and Odell Griffin, Appellants,

v.

### UNITED STATES, Appellee.

### Nos. 07–CF–534, 07–CF–544.

District of Columbia Court of Appeals.

Argued Jan. 11, 2011.

Decided Sept. 22, 2011.

Judith A. Lovelace, for appellant Gonzales Diggs.

Steven R. Kiersh, Washington, DC, for appellant Odell Griffin.

Elizabeth H. Danello, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, John P. Mannarino, and Amanda Haines, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, Associate Judge, REID,* Associate Judge, Retired, and BELSON, Senior Judge.

* Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on April 7, 2011.

GLICKMAN, Associate Judge:

Gonzales Diggs and Odell Griffin appeal their convictions, following a jury trial, of second-degree murder while armed, assault with a dangerous weapon, and related offenses. Each appellant challenges the admission in evidence of out-of-court statements made by a government witness named Mark Fisher, who reported them to the police and testified against them before the grand jury; they argue that because Fisher professed to have suffered brain damage and consequent memory loss, he was not available for cross-examination within the meaning of the Confrontation Clause, and that his statements were inadmissible hearsay. Appellants raise other Confrontation Clause claims as well, asserting the trial court erred by limiting Griffin's cross-examination of Fisher and by admitting a certificate of no license to carry a pistol and an autopsy report without testimony from the documents' preparers. Appellant Griffin further claims that the court abused its discretion in denying his motion for severance after it redacted his out-of-court statement to the police in order to protect his co-defendant's confrontation rights. In addition, appellant Diggs claims that the seven-year delay in bringing him to trial violated his Fifth Amendment right to due process and his Sixth Amendment right to a speedy trial; that he was prejudiced by the addition of a conspiracy count in a superseding indictment; and that his convictions on two counts of possession of a firearm during a crime of violence merge.

We conclude that the admission of Fisher's grand jury testimony and statements to police did not violate appellants' rights under the Confrontation Clause or the hearsay rule. We also reject all but one of appellants' other claims of reversible error. The exception, conceded by the government, is Diggs's claim that the certificate of no license was admitted in evidence in violation of his Sixth Amendment right to be confronted by the witnesses against him. Accordingly, we reverse Diggs's conviction for carrying a pistol without a license. In all other respects, we affirm the judgments of the Superior Court.

## I. Factual Background

On the afternoon of November 9, 2000, four young men were sitting in a white Jeep Cherokee near the 1600 block of Fairlawn Avenue in Southeast Washington. As the young men sat there chatting, drinking, and smoking marijuana, a dark-colored Volkswagen Beetle pulled up and two armed men got out and opened fire at them without warning. The driver of the Jeep, Gregory Phelps, jumped out and escaped unharmed, as did the passenger in the seat directly behind him. The front seat passenger, Melvin Montgomery, also managed to get away, though he was shot in the ankle as he fled. Michael Smith, the back seat passenger behind Montgomery, was not so fortunate. He was shot in the head as he tried to escape into nearby woods. His shooting was not immediately reported to the police, but four days later, after Smith's family had reported him missing, his body was found lying in the brush on the side of the road near where the attack had taken place.

Phelps, testifying at trial pursuant to an immunity agreement, admitted that he had stolen the Jeep Cherokee. A few days before the shooting, Phelps explained, he and two confederates had broken into an apartment occupied by appellants Diggs and Griffin in order to rob them. The intruders, who were armed with a sawed-off shotgun, took appellants' jewelry and drugs, and Phelps grabbed a set of car keys. The keys were to the Jeep, which Phelps drove off in after finding it on the

street.[1] Phelps kept the vehicle until the attack on November 9. He initially told police he could not identify the attackers, but at trial he testified that he recognized one of them as Diggs, whom he had known prior to the robbery. Phelps could not identify the second gunman. None of the Jeep's other surviving occupants could identify either assailant, though Montgomery's physical description of one of them resembled Diggs.

The owner of the white Jeep Cherokee was appellant Griffin's sister. At trial she testified that she had purchased it in July 2000 and had allowed Griffin to drive it. The government also presented evidence that Griffin was seen driving what probably was the same vehicle shortly after the shooting.[2]

The critical evidence that enabled the government to prosecute appellants was supplied by Mark Fisher. Fisher's ex-wife was Diggs's sister and Griffin's cousin. On November 24, 2000, Fisher, who was then a sergeant in the United States Army, telephoned the homicide branch and reached Detective Willie Toland. Fisher identified himself and informed Toland that he knew who committed a homicide earlier in the month on Minnesota Avenue. By checking police records, Toland was able to determine that Fisher was referring to the November 9 shooting of Michael Smith.[3] Fisher identified Diggs and Griffin and explained to Toland that they had visited him before the shooting and told him of the robbery and the theft of the Jeep Cherokee. They later returned

to ask for Fisher's help in cleaning and loading a .45–caliber automatic handgun, saying they planned to use it to "scare somebody" and recover the Jeep. Fisher said he refused to lend appellants his own gun for the endeavor, but his wife gave it to them without his knowledge. Later, Fisher reported to Toland, Diggs and Griffin came back to his apartment and described how they had found the Jeep and attacked its occupants. One of the victims was shot in the head. Appellants returned Fisher's gun to him at that time, and he observed that it was covered with a carbon residue, indicating it had been fired.

Detective Toland was not assigned to the investigation of Michael Smith's murder. For reasons not explained in the record, no one from the police followed up on Fisher's call before he was deployed on military duty overseas in 2001. Fisher was not interviewed in person until he returned home in 2003, at which time he again implicated Diggs and Griffin in the homicide. Fisher also said he had hidden his gun in order to give it to the police, and the weapon was recovered. Fisher repeated his incriminating account in two grand jury appearances.

Subsequently, in 2005, Fisher became seriously ill. He suffered a total renal failure, was in a coma for several days, and sustained permanent brain damage that affected, to some degree, his short and long term memory. By the time of trial, Fisher claimed he could not recall his interactions with appellants in any detail. After a pretrial inquiry into Fisher's com-

1. When he was arrested, appellant Griffin made a statement in which he described the robbery and theft of the Jeep and denied knowing anything about Smith's subsequent murder. The government introduced this portion of his statement at trial.

2. Griffin's sister testified that the tag on her Jeep had an "M" and a couple of "8"s. On

November 19, 2000 (ten days after Smith was murdered), police in Prince George's County stopped Griffin while he was driving a Jeep with a tag number that included the letter "M" and the digits "48815."

3. The location of the shooting was in the vicinity of Minnesota Avenue S.E.

petency, in which expert witnesses opined that he was malingering, the court found that Fisher's professed memory loss was "not an inability to accurately perceive and recall and relate facts and testify truthfully, but ... more of a lack of willingness to do so." The court ruled that Fisher was competent to testify—a ruling not challenged on appeal—and concluded that his memory problems would not deprive appellants of the opportunity to cross-examine him.

## II. The Admission of Mark Fisher's Out–of–Court Statements

 When the government called Fisher to the stand at trial, he testified that he recalled being visited by appellants in November 2000 but could not remember the details. The government's effort to refresh Fisher's recollection with the transcript of his grand jury testimony was unsuccessful. Fisher still professed to remember the events only "vaguely"—"there was a robbery," he recalled, and "somebody [told] me that they shot somebody." Over defense objection, the trial court allowed the government to impeach Fisher's claim of memory loss with his testimony before the grand jury, in which he remembered appellants' three visits to his apartment and described them in detail. The court ruled that, as a prior inconsistent statement under oath, Fisher's grand jury testimony was admissible not only to impeach his trial testimony, but as substantive evidence.

The court also rejected Diggs's objections when, in opening statement, the government mentioned Fisher's November 2000 telephone call to Detective Toland. The court ruled that Fisher's report to Toland was admissible under the exception to the hearsay rule for prior identifications. In accordance with that ruling, Toland testified on direct examination that Fisher called and identified Diggs and Griffin as the persons "responsible" for Michael Smith's murder.[4] Toland did not elaborate on the substance of Fisher's report. On cross-examination, however, and without objection from Diggs, Griffin's counsel elicited that Fisher mentioned .45–caliber guns and said the decedent's "brother" had broken into an apartment and committed a robbery two days before the shooting. In apparent response to that opening, the prosecutor brought out further details on redirect. Without objection, Toland testified Fisher told him that the robbery took place in Diggs's apartment; Diggs and Griffin went to recover the stolen Jeep Cherokee; they shot one of the occupants of the Jeep in the head while the others fled; and they used a Colt .45, a "Mark–4" handgun, and .45–caliber ammunition.

 We reject appellants' contentions that Fisher's statements to the grand jury and Detective Toland were admitted in violation of their rights under the Sixth Amendment's Confrontation Clause.[5] "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."[6] It makes no difference that Fisher claimed to be unable to remember the events in issue; the Clause "includes no guarantee

---

4. It would have been clear to the jury that Fisher was reporting to Toland that appellants had admitted the murder, not that he saw them commit it, because by this point in the trial, Fisher himself already had testified, and the jury had heard his grand jury testimony.

5. Our review of this issue is de novo. *See Hartridge v. United States*, 896 A.2d 198, 223 (D.C.2006).

6. *Crawford v. Washington*, 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion." [7] Thus it is settled that memory loss, whether genuine or feigned, does not deprive the defendant of the meaningful opportunity to cross-examine that the Confrontation Clause requires. [8] In either case, the witness's claimed inability to recall is regarded as a form of the "forgetfulness, confusion, or evasion" that cross-examination is designed to emphasize, rather than as a barrier to cross-examination. [9] "[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination," even if the opportunity alone does not guarantee success. [10] Appellant had that opportunity in the present case: Fisher took the stand and was subject to cross-examination, and the jury could evaluate his credibility and his prior statements in light of whatever weaknesses were revealed.

■ We likewise reject appellants' hearsay objections as a basis for reversal. [11]

The trial court properly admitted Fisher's grand jury testimony as substantive evidence (as well as to impeach) pursuant to D.C.Code § 14–102(b)(1) (2001), which in pertinent part provides that "[a] statement is not hearsay if the declarant testifies at the trial ... and is subject to cross-examination concerning the statement and the statement is ... inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing or other proceeding[.]" [12] In conformity with this provision, Fisher testified and was available for cross-examination about his prior grand jury testimony, which was under oath, and that testimony was inconsistent with his claimed loss of memory at trial. [13]

■ Also admissible was Fisher's call to Detective Toland in which he identified appellants as persons who had confessed their commission of the murder directly to Fisher himself. Under D.C.Code § 14–102(b)(3), "an identification of a person made after perceiving the person" is

---

**7.** *United States v. Owens*, 484 U.S. 554, 558, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 21–22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)).

**8.** *See id.* at 559–60, 108 S.Ct. 838 (no Confrontation Clause violation in admitting out-of-court identification by witness who was unable to recall seeing his assailant by the time of trial); *Blunt v. United States*, 959 A.2d 721, 729–30 (D.C.2008) (no Confrontation Clause violation in admission at trial of witness's grand jury testimony even if her inability to remember the crimes at trial was feigned).

**9.** *See Blunt*, 959 A.2d at 729 ("A feigned inability to recall ... is only a form—aggravated, to be sure, if maintained consistently—of deliberate evasion[.]").

**10.** *Owens*, 484 U.S. at 558, 108 S.Ct. 838 (quoting *Fensterer*, 474 U.S. at 21–22, 106 S.Ct. 292).

**11.** We review the trial court's evidentiary rulings for abuse of discretion. *See Hartridge*, 896 A.2d at 223.

**12.** Griffin's argument on appeal, that Fisher's grand jury testimony was not admissible as a past recollection recorded, *see Isler v. United States*, 824 A.2d 957, 960 (D.C.2003), is thus beside the point. The grand jury testimony was not admitted pursuant to that hearsay exception.

**13.** *See Owens*, 484 U.S. at 561–64, 108 S.Ct. 838; *Blunt*, 959 A.2d at 731–32; *Mercer v. United States*, 864 A.2d 110, 113–14 (D.C. 2004) (upholding use of grand jury testimony to impeach witness who claimed at trial that she no longer remembered the case after having suffered a head injury and a series of strokes).

not hearsay, and is admissible as substantive evidence, so long as the declarant is available at trial for cross-examination concerning the statement.[14] Although Diggs objects that Fisher did not perceive appellants commit the shooting itself, the hearsay exception is as applicable to an identification of a confessor as it is to an identification of a perpetrator.[15] Indeed, in principle, the prior identification exception applies to an identification made by a witness to any relevant conduct. Moreover, and contrary to Diggs's other objection on appeal, the prior identification exception is not limited to an identification of a person unknown to the declarant; it is equally available where, as here, the declarant knew or had a relationship with the identified person prior to the perceived event.[16]

■ The hearsay exception applies only to statements of identification; additional detail pertaining to the offense or other conduct observed by the declarant "is admissible under this exception only to the extent necessary to make the identification understandable to the jury."[17] This

condition was satisfied during Detective Toland's testimony on direct examination: The witness provided no unnecessary details in reporting Fisher's identification of appellants. As the government concedes, the prosecutor's elicitation of further details of Fisher's incriminating account during Toland's redirect examination "may well have exceeded the limits" of the prior identification exception.[18] But neither Diggs nor Griffin made timely objection to that elicitation, and we cannot find plain error in the trial court's failure to curtail it *sua sponte*, particularly where Griffin's cross-examination of Toland arguably had opened the door to the admission of further details,[19] and where prejudice is less likely because those details had been adduced earlier in the trial through Fisher's grand jury testimony.

## III. Other Confrontation Clause Claims

■ Appellants present three other claims under the Confrontation Clause. First, appellant Griffin complains that the trial court restricted his cross-examination

**14.** D.C.Code § 14–102(b); *see Brown v. United States,* 840 A.2d 82, 89 (D.C.2004). As discussed above, Fisher was available for cross-examination about his identification.

**15.** Appellants did not request a limiting instruction explaining that Detective Toland's testimony was admitted only to establish that Fisher had identified appellants as confessors, and not as independent evidence that they in fact had confessed. We cannot find that appellants were prejudiced by the failure to give such a limiting instruction. Fisher's grand jury testimony supplied admissible substantive evidence of appellant's self-incriminating statements. (And although those statements were hearsay, they were admissible under the exception for statements by a party opponent. *See Harris v. United States,* 834 A.2d 106, 115–16 (D.C.2003).)

**16.** *See, e.g., Williams v. United States,* 756 A.2d 380, 387 (D.C.2000) (identification of

person involved in sexual relationship with declarant permissible).

**17.** *Brown,* 840 A.2d at 89 (quoting *Porter v. United States,* 826 A.2d 398, 410 (D.C.2003)).

**18.** Brief for Appellee at 47.

**19.** *See Busey v. United States,* 747 A.2d 1153, 1166 (D.C.2000) ("We have sometimes said that under the doctrine of curative admissibility the prosecution may introduce otherwise inadmissible evidence after the defense has 'opened the door,' while we simultaneously have warned that this doctrine must not be overused to prejudice the defendant unfairly. *See Mercer v. United States,* 724 A.2d 1176, 1192 (D.C.1999). At bottom, the notions of 'opening the door' and 'curative admissibility' rest on the more general concept that the balance of prejudice against probative value may change during the course of a trial.").

of Fisher with regard to steroid abuse and psychiatric treatment in 2000. The complaint is without merit. In response to Griffin's questions on cross, Fisher denied using steroids or other drugs; denied "feeling the mental effects of chronic steroid abuse" or being on psychotropic drugs when he spoke with the police; and denied "being treated for mental health problems" at that time. Fisher's subsequent health problems were explored as well, and Griffin made no proffer that the witness was withholding relevant information. Griffin plainly was allowed sufficient leeway to satisfy the requirements of the Sixth Amendment, and the trial court did not abuse its discretion by curtailing further questioning about the witness's supposed steroid use and psychiatric treatment in order to avoid harassment and end repetitive interrogation of marginal relevance at best.[20]

▮▮▮▮ Griffin also claims he was denied his right of confrontation when the prosecution introduced Michael Smith's autopsy report without calling the medical examiner who wrote it.[21] (The authoring examiner being unavailable, the Chief Medical Examiner of the District of Columbia testified in her stead.) But Griffin did not object to the admission of the autopsy report, and his claim therefore is "subject to the rigors of plain error review."[22] It does not survive that scrutiny. We need not decide whether the autopsy report constituted testimonial hearsay (the only kind of hearsay to which the Confrontation Clause applies); even if it did, we cannot conclude that the putative error in its admission prejudiced Griffin's defense or that it seriously affected the fairness, integrity, or public reputation of the judicial proceeding.[23]

Finally, Diggs argues that his conviction for carrying a pistol without a license (CPWL) must be reversed because, over his objection, the court allowed the government to introduce a certificate of no license without testimony from its preparer. The government concedes that this was a Confrontation Clause violation that cannot be deemed harmless beyond a reasonable doubt.[24] Accordingly, we reverse Diggs's CPWL conviction.[25]

20. *See, e.g., Elliott v. United States*, 633 A.2d 27, 32 (D.C.1993); *see also Velasquez v. United States*, 801 A.2d 72, 79 (D.C.2002) ("One's psychiatric history is an area of great personal privacy which can only be invaded in cross-examination when required in the interest of justice.") (internal quotations omitted).

21. *See Bullcoming v. New Mexico*, —— U.S. ——, 131 S.Ct. 2705, 2710, 180 L.Ed.2d 610 (2011) (holding that the Confrontation Clause does not permit the prosecution "to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification").

22. *(Michael) Thomas v. United States*, 914 A.2d 1, 6 (D.C.2006).

23. *See Mungo v. United States*, 987 A.2d 1145, 1154–55 (D.C.2010) (finding no plain error in presumptively erroneous admission of autopsy notes without testimony from their author); *see also (Michael) Thomas*, 914 A.2d at 21–24.

24. *See Tabaka v. District of Columbia*, 976 A.2d 173, 175–76 (D.C.2009) (relying on *Melendez–Diaz v. Massachusetts*, —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009)). *Tabaka* was decided after the trial in this case and superseded a prior decision of this court permitting the introduction of a certificate of no license without testimony from its preparer.

25. Because the trial court ordered that its sentence for CPWL would run concurrently with the other, longer sentences it imposed, reversal of the CPWL conviction will not affect the length of time Diggs will serve in prison or on supervised release. The court therefore will not need to re-sentence Diggs on remand.

## IV. Denial of Severance

 Griffin was arrested for the murder of Michael Smith in August 2004. After declaring that he knew nothing about the murder, he gave a brief statement about the theft and recovery of his sister's Jeep:

> All I know we were getting high and some [robbers] came in there and robbed us[.] [O]ne put a shotgun in my head and took my jewelry and my sister's jeep because I dropped the keys and they took it[.] [A]nd I told Tony [Diggs] after they robbed us, get my sister['s] truck back from those [robbers] and Tony left, and I walked home because I was high. Tony got the truck back and brought it to me two days later at my house[.]

Recognizing that the latter part of Griffin's statement incriminated Diggs, the trial court ruled that the government could introduce only the first two sentences (describing the robbery) in evidence at appellants' joint trial.[26] Griffin objected to this redaction. Arguing that the rule of completeness entitled him to have his entire statement put before the jury, he moved for a severance of his trial from that of Diggs. The court denied the motion. Thereafter, in accordance with the court's ruling, a detective testified about Griffin's statement without mentioning what he said about Diggs and the recovery of the Jeep.

 Griffin argues that the trial court abused its discretion in refusing to grant him severance. To succeed with this claim, Griffin must demonstrate that he suffered "manifest prejudice" from the joinder.[27] This he fails to do, we conclude, because the premise of his claim is invalid: Griffin would not have been entitled to invoke the rule of completeness had he been tried alone.

 The rule of completeness does not provide that when part of an out-of-court statement is introduced against its maker, the declarant has an automatic right to insist that other parts be admitted too, simply because they are favorable to his position. Rather, the rule contemplates that other parts of the statement should be admitted, in the trial court's discretion, "when this is necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact."[28] As applied in a criminal case, the rule "is typically implicated when the prosecution selectively introduces only the inculpatory portions" of a defendant's statement, and fairness requires that exculpatory parts of the same statement be considered as well so that the defendant's meaning is not distorted or misunderstood.[29]

---

**26.** Griffin's statement had to be redacted to avoid prejudice to Diggs because it was inadmissible against Diggs under the Confrontation Clause and the rule against hearsay. *See (Keith) Thomas v. United States*, 978 A.2d 1211, 1222–25 (D.C.2009).

**27.** *Moore v. United States*, 927 A.2d 1040, 1056 (D.C.2007).

**28.** *Butler v. United States*, 614 A.2d 875, 882 (D.C.1992) (quoting *United States v. Marin*, 669 F.2d 73, 84 (2d Cir.1982)). Implementation of the rule is committed to the trial court's discretion, and in a multi-defendant case, the court may balance the declarant defendant's interest in introducing other portions of his statement against the non-declarant defendant's interest in confronting the statement's maker. *See Butler*, 614 A.2d at 882–83; *see also United States v. Edwards*, 159 F.3d 1117, 1127 (8th Cir.1998) (recognizing "practical reasons why codefendants should not be able to invoke the rule of completeness to introduce otherwise inadmissible exculpatory hearsay").

**29.** *Henderson v. United States*, 632 A.2d 419, 426 (D.C.1993); *cf. Butler*, 614 A.2d at 882 ("The rule of completeness is violated ... only where admission of the statement in its edited form distorts the meaning of the state-

The excluded portion of Griffin's statement was not "necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact." The jury heard Griffin's entire description of the robbery, and his account of that event was not distorted in any way by the omission of his statement about a different subject, the recovery of the stolen Jeep. Griffin's assertion that knew nothing about Michael Smith's murder, of which the jury also was informed, likewise was not distorted and required no clarification. This is not a case in which the prosecution introduced an inculpatory portion of the defendant's statement selectively or out of context. Accordingly, the mere fact that the redacted portion of Griffin's statement may have been self-exculpatory is not enough to require its admission under the rule of completeness.[30] The rule of completeness is not an exception to the rule against hearsay.[31]

Because Griffin would not have been entitled to have the balance of his statement to police introduced in evidence at a separate trial, he was not prejudiced by the court's rulings requiring redaction of the statement and denying severance. No abuse of discretion has been shown.

## V. Diggs's Speedy Trial Claims

Michael Smith's body was found on November 13, 2000. Diggs was arrested on September 1, 2004, and his trial commenced on February 1, 2007. He contends that the nearly four-year delay in effecting his arrest violated his Fifth Amendment right to due process, and that the 29–month delay between his arrest and trial violated his Sixth Amendment right to a speedy trial.[32] We conclude that Diggs has not made the showing necessary to prevail on either of these claims.

In order to establish a due process violation in pre-arrest delay, "appellant must show at a minimum that he actually was prejudiced by the delay and that the government's reasons [for failing to arrest more expeditiously] were unjustified."[33] Diggs's claims of prejudice—for example, that he lost the opportunity to locate witnesses to the shooting or to dig up evidence that Smith actually was shot and killed some time later than November 9—are too speculative to show actual prejudice to his defense.[34] Nor does Diggs show that the police delayed his arrest for constitutionally unacceptable purposes. The record is less than clear as to the reasons for the extended delay, though the police investigation evidently was impeded

ment or excludes information substantially exculpatory of the declarant.") (quoting *United States v. Kaminski*, 692 F.2d 505, 522 (8th Cir.1982)).

**30.** *See United States v. Bollin*, 264 F.3d 391, 414 (4th Cir.2001) (explaining that where "the omitted testimony was not necessary to avoid misleading the jury or otherwise place the admitted testimony in context[,][t]he fact that some of the omitted testimony arguably was exculpatory does not, without more, make it admissible under the rule of completeness").

**31.** *See, e.g., United States v. Lentz*, 524 F.3d 501, 526 (4th Cir.2008); *Edwards*, 159 F.3d at

1127 n. 6. *See generally* 7 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2113, at 656–60 (James H. Chadbourn, ed., 1978).

**32.** The speedy trial protections of the Sixth Amendment are not activated until a defendant has been arrested or formally charged. *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

**33.** *Asbell v. United States*, 436 A.2d 804, 812 (D.C.1981) (citing, *inter alia, United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)).

**34.** *See, e.g., Robinson v. United States*, 452 A.2d 354, 357 (D.C.1982).

by Fisher's overseas military service and other witness difficulties. (Phelps, the only other person who could identify Diggs, was a reluctant and inconsistent witness.) But whether the police were less than diligent in pursuing the investigation is not the issue. At least in the absence of severe prejudice to the defense, negligence (even gross negligence) on the part of the police is not enough to support a due process claim.[35] At a minimum, it must be shown that the police "deliberately sought to hinder the defense or acted recklessly in failing to arrest [the defendant] in a timely manner."[36] The record before us does not reveal such improper motivation or recklessness. Accordingly, we hold that Diggs was not denied due process by the pre-arrest delay in this case.

He fares no better with his Sixth Amendment claim. As instructed by the Supreme Court in *Barker v. Wingo*,[37] we assess a speedy trial claim in light of four factors: the "[l]ength of delay, the reason for the delay, the defendant's assertion of

his right, and prejudice to the defendant."[38] The balance of these factors weighs against finding a constitutional violation in this case.

*Length of Delay.* Twenty-nine months elapsed between Diggs's arrest and trial. That is more than enough to "trigger the *Barker* enquiry."[39] We recognize, however, that "the more serious and complex the charge, the greater is the delay that will be tolerated" because of the extended pretrial preparation required.[40] In cases such as this one, a first-degree murder case with two co-defendants, comparable and even longer delays "have been countenanced by this court when all factors were considered."[41]

*Reasons for the Delay.* In evaluating the causes of the delay, we focus primarily on whether and to what extent it was due to a deliberate attempt by the prosecution to gain tactical or other advantage; a more neutral reason, such as scheduling difficulties or negligence; or a valid reason, such as a missing witness.[42]

---

35. *See, e.g., United States v. Day*, 697 A.2d 31, 34 (D.C.1997).

36. *Bradley v. United States*, 856 A.2d 1157, 1165 (D.C.2004). *See also Marion*, 404 U.S. at 324, 92 S.Ct. 455 ("[T]he Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.").

37. 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

38. *Id.* at 530, 92 S.Ct. 2182; *see also Graves v. United States*, 490 A.2d 1086, 1090–91 (D.C. 1984) (en banc), *partially overruled on other grounds by United States v. Loud Hawk*, 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986), as explained by *Sell v. United States*, 525 A.2d 1017, 1021 (D.C.1987).

39. *Doggett v. United States*, 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). In general, a delay of a year or more is enough to constitute "prima facie evidence" of a speedy trial violation. *Hartridge v. United States*, 896 A.2d 198, 208 (D.C.2006).

40. *Graves*, 490 A.2d at 1091 (citations omitted).

41. *Hartridge*, 896 A.2d at 208 (citing cases).

42. *Id.* In ways not particularly important here, our cases have refined this tripartite categorization to recognize, for example, an intermediate category of "significant" delay for "government actions deemed less culpable than deliberate foot-dragging to gain tactical advantage but more culpable than the neutral category exemplified by failure to advance trial dates due to court congestion." *Graves*, 490 A.2d at 1092 (citations omitted).

In this case, none of the 29–month delay was due to deliberate obstruction, procrastination, or gamesmanship on the part of the government. On the contrary, all of the delay had a neutral or valid explanation, consisting mainly of: (1) the government's difficulties in locating witnesses while the case was pending before the grand jury; (2) scheduling difficulties and conflicts of various sorts, for which no blame can be assessed against either party; (3) Fisher's medical emergency, which caused him to be unavailable for a period of time; and (4) the protracted inquiry, initiated by appellants, into Fisher's competency to testify, which culminated in the pretrial litigation of appellants' unsuccessful motion to bar the prosecution from calling him as a witness.[43] These reasons, considered in their entirety, lend little weight to Diggs's claim that his right to a speedy trial was violated.

Diggs complains that the government prolonged the pretrial period when, on August 31, 2006 (five months before trial began), it obtained a superseding indictment that added a count of conspiracy to commit assault with a dangerous weapon. We disagree. The late addition of the conspiracy charge did not occasion any delay of trial.[44]

■ *Assertion of the Right.* Diggs invoked his Sixth Amendment right to a speedy trial on four occasions. He briefly asserted the right at his April 21, 2005, arraignment. Next, he declared at a status hearing in December 2005 that he did not waive his right to a speedy trial by agreeing to a three-month continuance so that a defense expert could examine Fisher's medical records. Diggs did not mention the subject of a speedy trial again until June 2006, when the government—having just received the defense expert's report on Fisher's competency—sought time for its own expert to evaluate the report and examine Fisher himself. Along with his co-defendant, Diggs opposed that request and moved to dismiss the indictment on speedy trial grounds. Appellants cited the right to a speedy trial again when, in September 2006, they jointly moved to dismiss the superseding indictment. In neither motion did Diggs (or Griffin) request a prompt trial as an alternative to dismissal.

■ "The defendant's assertion of his speedy trial right, the Supreme Court has

---

**43.** At the outset, the competency inquiry was held up by the hospital's tardiness in responding to a government subpoena for Griffin's medical records. When the medical records finally were delivered approximately two months after they were subpoenaed, the court had to review them *in camera* and provide redacted copies to the parties. Further time was taken up with the experts' examinations of Fisher's medical records and of Fisher himself. Fisher delayed his examination when he unexpectedly went out of town for several weeks. The preparation and sharing of the experts' reports and other data was yet another step that had to be completed before the competency issue could be litigated and resolved.

**44.** Nor, as the trial court ruled in denying their motion to dismiss the superseding indictment, did the late addition of the conspiracy charge prejudice appellants' ability to prepare for trial. The government added the charge, perhaps out of an abundance of caution, in response to this court's then-recent decision in *Wilson–Bey v. United States*, 903 A.2d 818 (D.C.2006) (en banc) (holding that a conviction for first-degree murder on an aiding-and-abetting theory requires proof that the defendant had the same *mens rea* as the principal offender). The conspiracy charge was not based on new evidence and did not add a new theory of liability—the court could have given a conspiracy instruction under the original indictment. Diggs's assertions that the government abused the grand jury process by obtaining the superseding indictment, and that it did so to retaliate against the defense, are without record support.

said, 'is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.' " [45] But not all invocations are equal: "[T]he assertion of the right must be considered in light of its 'frequency and force' in order to avoid 'attaching significant weight to a purely *pro forma* objection.' " [46] With that principle in mind, we attach little evidentiary significance to Diggs's sporadic assertions. The first two were merely *pro forma*, and Diggs's later invocations in the motions to dismiss are "weakened by his failure to move for an immediate trial in the alternative." [47] Diggs never evinced a sincere desire for a prompt trial. [48]

■■■ *Prejudice.* The speedy trial guarantee of the Sixth Amendment is intended to prevent oppressive pretrial incarceration, minimize the anxiety and concern of the accused, and limit the possibility that the defense will be impaired. [49] Of these three forms of prejudice, the Supreme Court has said, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." [50]

Diggs did suffer one form of cognizable prejudice from the delay of his trial: He was held in pretrial confinement without bond for 21-1/2 months. His incarceration was alleviated in June 2006, when the trial court released him into a high-intensity supervision program. Diggs has not established that he suffered the other types of prejudice the speedy trial guarantee is meant to forestall. He has not demonstrated that "anxiety and concern had a specific impact on his health or personal or business affairs." [51] Nor, critically, has he shown that the delay impaired his defense. Diggs has not, for example, identified any exculpatory evidence that has been lost or any defense witness whose recollection has faded as a result of the post-arrest delay. The speculative possibility that an opportunity for earlier defense investigation might have generated evidence favorable to the defense is not enough. While Mark Fisher suffered memory loss during the relevant period, we fail to see how that prejudiced Diggs—"deficiencies in the testimony of government witnesses generally benefit a defendant's case rather than work to its detriment." [52] If anything, Fisher's memory loss hindered the prosecution in this case.

■■■ *Weighing the Four Factors.* The four *Barker* factors "are related and must be considered together with other relevant circumstances in 'a difficult and sensitive balancing process.' " [53] The record here shows a lengthy but not exceptional delay in a complicated and serious case; neutral and valid reasons for the delay; a feeble and half-hearted assertion of the right to a speedy trial; and limited

**45.** *Graves,* 490 A.2d at 1098 (quoting *Barker,* 407 U.S. at 531–32, 92 S.Ct. 2182).

**46.** *Hammond v. United States,* 880 A.2d 1066, 1086 (D.C.2005) (quoting *Dickerson v. United States,* 650 A.2d 680, 685 (D.C.1994)).

**47.** *Id.* (citing *Graves,* 490 A.2d at 1098).

**48.** Compare the "repeated and insistent" demands for a prompt trial recounted in *Hartridge,* 896 A.2d at 226 (Glickman, J., dissenting).

**49.** *Barker v. Wingo,* 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

**50.** *Id.*

**51.** *Hammond,* 880 A.2d at 1087 (internal quotation marks, brackets and citation omitted).

**52.** *Tribble v. United States,* 447 A.2d 766, 772 (D.C.1982).

**53.** *Graves,* 490 A.2d at 1091 (quoting *Barker,* 407 U.S. at 533, 92 S.Ct. 2182).

prejudice resulting from the delay. There was no evident impairment of Diggs's defense, and "[t]he absence of this most serious form of prejudice weighs heavily in our determination of whether appellant was deprived of his right to a speedy trial."[54] In cases comparable to this one, we have concluded that the balance tilted against finding a Sixth Amendment speedy trial violation.[55] We come to that same determination here.

### VI. Conclusion

 For the foregoing reasons, we reverse appellant Diggs's conviction for carrying a pistol without a license. In all other respects, we affirm the judgments of the Superior Court.[56]

*So ordered.*

---

**54.** *Hartridge*, 896 A.2d at 212 (quotation marks and brackets omitted).

**55.** *See, e.g., id.* at 207–13; *Hammond*, 880 A.2d at 1079–88.

**56.** Diggs argues that his two convictions for possessing a firearm during a crime of violence ("PFCV"), for which he received concurrent sentences, merge. We disagree. The predicate offenses for the two PFCV convictions were the murder of Smith and the as-

sault on Montgomery, and the record does not indicate that appellants fired at those two victims simultaneously or in a single violent action. Rather, it appears that Smith and Montgomery were shot at separately as they fled in different directions. "Therefore, despite the proximity of the crimes in time and place, they constitute distinct violent crimes, and the PFCV convictions do not merge." *Wages v. United States*, 952 A.2d 952, 964 (D.C.2008).