Marquette WARD & Franklin M.
Thompson, Appellants,

v.

UNITED STATES, Appellee.

Nos. 07–CF–58, 07–CF–234.

District of Columbia Court of Appeals.

Argued Oct. 4, 2012.
Decided Nov. 15, 2012.

Robert Feitel, with whom Sandi S. Rhee and Robert Spelke were on the brief, for appellant Marquette Ward.

Sarah A. Maguire, with whom Jessie K. Liu, Washington, DC, was on the brief, for appellant Franklin Thompson.

Elizabeth H. Danello, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Deborah Sines and Michelle Jackson, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, Associate Judges, and FARRELL, Senior Judge.

THOMPSON, Associate Judge:

On October 31, 2006, after a several-week trial, a jury convicted appellants Marquette Ward and Franklin Thompson of several offenses relating to the shooting deaths of Mario Evans and Jakhema "Princess" Hansen in the Sursum Corda neighborhood of N.W. Washington. Ward was convicted of the first-degree premeditated murder while armed of Mario Evans; carrying a pistol outside his home or place of business without a license; conspiracy to murder Hansen; first-degree premeditated murder while armed (Hansen); assault with intent to kill while armed ("AWIKWA") (victim Tonique White); first-degree burglary while armed; first-degree (felony) murder while armed (Hansen); two counts of obstruction of justice (with respect to Hansen and witness Timika Holiday); and four counts of possession of a firearm during a crime

of violence ("PFCV"). Thompson was convicted of the same offenses except the murder of Evans and the related PFCV charge.

In these appeals, Ward contends that he was denied his Sixth Amendment right to a speedy trial. Both Ward and Thompson contend that the trial court erred in permitting the government to elicit hearsay testimony recounting statements by Hansen and statements appellants made to government witness Devin Evans, who had been a fellow inmate of each in the D.C. Jail. Additionally, both appellants argue that the court erred in denying their motions for severance. Thompson further contends that he was charged with and convicted of multiplicitous crimes, in violation of his right to due process. We conclude that some of appellants' convictions merge, and we therefore remand to the trial court for it to determine which affected convictions to vacate. In all other respects, we affirm the judgments of conviction.

## I.

We summarize the evidence only briefly. Holiday testified that on January 18, 2004, Mario Evans was selling PCP in the hallway of a Sursum Corda apartment building. Among the other people in the hallway were Ward, Hansen, Holiday and one Bernard Smith. Ward and Evans began to argue when Evans refused to sell Ward a PCP-laced cigarette for a discounted price. After arguing for some time, Ward paid the full price and left the hallway. Shortly thereafter, Ward returned and opened fire on Evans, killing him. Holiday spoke with police officers who arrived on the scene, identified Ward as the shooter, and told the police that Hansen had also witnessed the shooting.

Holiday further testified that on January 23, 2004, Hansen and Holiday were approached by Thompson, who warned Hansen that she had "better not be snitching." Later that day, while Hansen was visiting Holiday at Holiday's grandmother's house, a masked Thompson burst into the house and began shooting, killing Hansen (who was in the living room with Holiday) and injuring White (Holiday's sister, who was in the kitchen). Thompson also pointed his gun at Holiday, but realized that it was empty and then left the house. The government's theory at trial was that Thompson, a friend of Ward, murdered Hansen and attempted to kill Holiday to prevent them from testifying about the Mario Evans murder.

## II.

On January 24, 2004, Ward was arrested and held for the Mario Evans murder. On October 24, 2004, a grand jury indicted Ward, charging him with the murder of Evans as well as firearm offenses. Ward was arraigned on November 2, 2004, and an initial trial date was set for March 7, 2005. However, several delays ensued, including delay attendant to the grand jury's handing down of a superseding indictment on June 1, 2005, and pre-trial motions did not begin until September 11, 2006.

For Sixth Amendment speedy-trial purposes, the clock starts with "either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge," *Dillingham v. United States*, 423 U.S. 64, 65, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975), and stops when pre-trial motions hearings commence. *Hartridge v. United States*, 896 A.2d 198, 207 (D.C.2006) (stating that this is when "trial" is deemed to start). A delay exceeding one year between formal charging and trial "gives prima facie merit to a claim that an accused has been denied the right to a speedy trial, creates a pre-

sumption of prejudice, and shifts the burden to the government to justify the delay." *Moore v. United States,* 675 A.2d 71, 74 · (D.C.1996) (internal quotation marks omitted). Ward contends that his right to a speedy trial was violated in that his trial was delayed for 33 months. He contends that he was prejudiced by the delay because, by the time of trial, Smith (who, defense counsel proffered, stated during a February 2004 videotaped interview that Ward did not shoot Mario Evans) was claiming that he could no longer "remember what happened back in 2004." Ward also argues that during the delay, he suffered emotional harm from a lengthy stay in the "equivalent of solitary confinement," deprived of contact with family and friends.

To determine whether a defendant's right to a speedy trial was violated, the trial court must employ a balancing test in which it weighs the conduct of both the prosecution and the defendant. *See Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *see also id.* at 521, 92 S.Ct. 2182 (noting that it is "impossible to determine with precision when the right has been denied"). The factors the court must analyze are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 92 S.Ct. 2182. These factors must be considered "together with such other circumstances that may be relevant" in a "difficult and sensitive balancing process." *Id.* at 533, 92 S.Ct. 2182. This court's duty in reviewing the trial court's decision is to "assess[ ] [the] evidentiary support for the facts that have been determined respecting" the *Barker* factors. *Reid v. United States,* 402 A.2d 835, 837 (D.C.1979). We are bound by the trial court's findings of fact, and we will not reverse "unless they are plainly wrong or without evidence to

support them," or unless there are errors of law. *Hartridge,* 896 A.2d at 207 (internal quotation marks omitted).

In evaluating the reasons for delay, "we focus primarily on whether and to what extent it was due to a deliberate attempt by the prosecution to gain tactical or other advantage" or, instead, "a more neutral reason." *Diggs v. United States,* 28 A.3d 585, 599 (D.C.2011). Deliberate attempts to delay trial to hamper the defense should be weighed heavily against the government. *Barker,* 407 U.S. at 531, 92 S.Ct. 2182. Although chargeable to the government, investigative delay "is considered more 'neutral' and is 'weighted less heavily' against the government." *Lyons v. United States,* 683 A.2d 1080, 1085 (D.C. 1996) (quoting *Barker,* 407 U.S. at 531, 92 S.Ct. 2182). Delay caused by a prosecutor's unavailability due to conflicting trial dates is charged to the government and is considered · significant delay but is not weighed as heavily as purposeful delay. *See Hammond v. United States,* 880 A.2d 1066, 1082 (D.C.2005). While the government bears responsibility for delays arising from its choice to proceed jointly against co-defendants, "in light of the policy considerations favoring joinder, this responsibility does not weigh heavily against the government." *Id.* at 1081 (internal quotation marks omitted). Reasons such as an overcrowded court docket are considered neutral and, although charged to the government, are not weighed heavily. *Id.* at 1079–80. Further, "the more serious and complex the charge[s], the greater is the delay that will be tolerated because of the extended pretrial preparation required." *Diggs,* 28 A.3d at 599 (internal quotation marks omitted).

In this case—one the trial court referred to as "a case of this complexity"—the evidence supports the trial court's finding that only a relatively small portion of

the delay "weigh[s] heavily against the Government." Appropriately, the trial judge did not weigh heavily against the government the delay that ensued while the government was still investigating (explaining that he did not understand how the defense could "make a call as to what [the government] need[s] to do, how they need to do it, when they need to do it, [and] why they need to do it to get somebody indicted").[1] Although Ward argues that the shooting of Evans was a simple offense that could have been indicted and tried without delay, the prosecutor explained to the court that the matter was complicated because, among other things, the government was "looking at Mr. Ward's drug dealing and looking at possible RICO charges." We have no basis for gainsaying that explanation.

■ We treat as chargeable to the government the continuance of the trial from March 2005 until June 21, 2005, requested by the government on the ground that the prosecutor then assigned to try the case as lead counsel was unavailable due to other trials. However, during that time, the government continued to investigate the connection between the Evans murder and the Hansen murder—an investigation that resulted in the grand jury's issuing the superseding indictment charging Ward

with conspiracy and obstruction of justice in connection with Hansen's murder and with the assaults on Holiday and White. Although we "may assume that some portion of" the time needed to obtain a superseding indictment is chargeable to the government, *Long v. United States*, 910 A.2d 298, 303 (D.C.2006), we are persuaded that in this case, the trial court did not err in declining to weigh heavily against the government the indictment delay.[2]

■ Delays chargeable to Ward and additional neutral delays occurred after issuance of the superseding indictment, which joined the Ward and Thompson cases. At arraignment on June 21, 2005, Ward's counsel declined to enter his appearance for the additional counts added in the superseding indictment. Not until after the court offered to appoint Ward's counsel under the Criminal Justice Act, did counsel agree to represent Ward on the additional counts, accepting appointment on October 26, 2005. But, the record further shows, the trial court's calendar did not allow for a fall trial, and Thompson's then-counsel was not available until March 2006. In addition, on November 30, 2005, Thompson's then-counsel withdrew because of a conflict of interest, and it was necessary for the court to appoint

1. As we have previously observed, requiring immediate indictments could act to "impair the prosecutor's ability to continue the investigation or obtain additional indictments," "pressure prosecutors to resolve doubtful cases in favor of early (and possibly unwarranted) prosecutions," and ultimately "preclude full consideration of the desirability of not prosecuting in particular cases." *Tolliver v. United States,* 378 A.2d 679, 681 (D.C.1977) (noting that "there is no constitutional requirement that charges must be filed after there is sufficient evidence to prove guilt but before an investigation is complete").

2. Ward argues that even at an early stage after his arrest, the government suspected

that there was at least some relationship between the Evans and Hansen murders. The prosecutor told the trial court, however, that it could not have obtained the superseding indictment any earlier than it did because, while circumstances earlier gave "the flavor that something more was amiss than just Mr. Ward acting on his own or Mr. Thompson acting on his own," the government did not have the basis (most notably, the statement of Devin Evans, discussed *infra* ) needed for additional charges until the spring of 2005. We discern no basis for concluding that the government took longer than was reasonably required to complete its investigation.

new counsel. Accordingly, the court set a new trial date of March 20, 2006. Even though the government generally bears responsibility for delays arising from joinder, we are satisfied that the foregoing developments "prevent weighing . . . heavily against the government" the approximately nine-month delay between June 21, 2005, and March 20, 2006. *Hammond,* 880 A.2d at 1082.[3]

On January 12, 2006, the government again filed a motion to continue trial, this time until June 2006, because of the lead prosecutor's schedule. However, Ward's counsel was unavailable until the second week of September. As a result, the court set a new trial date of September 11, 2006. Thus, only a portion of the delay just described was directly chargeable to the government.

■ Considering the various circumstances discussed above, we can see no error in the trial court's determination that Ward did not demonstrate that his trial was so unjustifiably delayed as to entitle him to relief. We also agree with the trial court's reasoning that Ward's claim of prejudice fails. To be sure, impairment of a defendant's preparation of his defense— the "most serious" prejudice, *Barker,* 407 U.S. at 532, 92 S.Ct. 2182—may result where a defense witness is unable accurately to remember events he may have witnessed. *Id.* However, here, Ward has not shown a reasonable likelihood that Smith's claimed memory loss would have been avoided if trial had been held earlier. Indeed, as the trial court observed, the defense did not "know whether [Smith, if called to testify] would change his mind" or "whether he would have said he remembered or not" "when he got on the stand[.]" In addition, the trial court heard

testimony that fellow inmates either sent and received mail on Ward's behalf and made phone calls for him. The record thus supports the trial court's finding that although Ward was held under restrictive conditions (requested by the government because he was charged with procuring the killing of one witness while in jail, and because "there was credible evidence that he sought to kill another"), he "found a way to get around no communication" and to "get around the jailers' oppressive conditions" (and, in addition, was permitted to communicate with his counsel). In short, Ward has not shown the kind of "oppressive pretrial incarceration," *id.,* that could weigh in favor of relief.

### III.

Both appellants contend that the trial court erred in allowing government witnesses to testify about statements made by the decedent Hansen, including the following: Kizzy Black, Shawnta Collier, and Gail Gurley all were allowed to testify that Hansen told them that she saw Ward kill or shoot at Mario Evans. Gurley was also permitted to testify that Hansen told her that Ward contacted Hansen and warned her to "lay low." Gurley further testified that she drove Hansen to the Violent Crimes Branch to speak with police and that en route, Hansen told Gurley that Ward was following them in a black truck. Holiday was permitted to testify to what Hansen said Ward told Hansen during a telephone call, i.e., that Hansen and Holiday were not to "open [their] mouth[s]" and that Ward would "look out for" them "in money terms" "once th[e] situation die[d] down." In addition, Metropolitan Police Department Detective Willie Jeffer-

---

**3.** As the trial court aptly put it, Ward was "just as much a part [in the] delay as [the government was]."

son testified that Hansen told him that she "was not there at the shooting," that she knew nothing about it, that she "wasn't no snitch," and that nothing was going to happen to her because she had "the best pussy in the Sursum Corda."

 Appellants contend first that admission of Hansen's statements violated their Sixth Amendment right to confront witnesses against them. We reject this claim as to statements Hansen made to her friends (Black, Gurley, and Holiday) because we discern no basis for treating them as testimonial. Only testimonial hearsay is "subject to the strictures of *Crawford* [*v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ]," *Thomas v. United States*, 978 A.2d 1211, 1227 (D.C.2009), and, as the Supreme Court observed in *Crawford*, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." 541 U.S. at 51, 124 S.Ct. 1354. As to the statements Hansen made to Detective Jefferson, they were not offered or admitted for their truth, and thus were not hearsay (and, *a fortiori*, were not testimonial hearsay).[4]

 Moreover, even if we assume *arguendo* that Hansen's statements were testimonial and that the testimony relaying them was hearsay, we agree with the trial court that the testimony fell under the forfeiture-by-wrongdoing doctrine, adopted by this court in *Devonshire v. United States*, 691 A.2d 165 (D.C.1997). Under that doctrine, "a defendant forfeits his Sixth Amendment right to be confronted by a witness against him, as well as his objection to the introduction of hearsay, if he wrongfully procured the unavailability of that witness with the purpose of preventing the witness from testifying." *Roberson v. United States*, 961 A.2d 1092, 1095 (D.C.2008) (explaining that "forfeiture ensues whether it was the defendant himself or another co-conspirator who made the witness unavailable-so long as the actor's misconduct was within the scope of the conspiracy and reasonably foreseeable to the defendant" (internal quotation marks omitted)).

Ward contends that the *Devonshire* doctrine was inapplicable as to him because the only evidence that the government offered to establish his role in a conspiracy to kill Hansen was the hearsay statement of his alleged co-conspirator Thompson.[5] Thompson contends that the forfeiture-by-wrongdoing doctrine as adopted in *Devonshire* does not apply to him because he was not accused of killing Hansen to prevent her from testifying against Thompson; rather, the government's allegation was that Thompson killed Hansen to keep her from testifying against Ward.[6]

---

4. Although Thompson may be correct that the government used Hansen's statements to Detective Jefferson "to establish that she lied to the police, which was probative of the fact that Mr. Thompson had warned her not to snitch," that does not amount to using Hansen's statements to prove the truth of the matter asserted (i.e., a use that would render Detective Jefferson's testimony relaying the statements "hearsay").

5. Ward's reference is to Devin Evans's testimony that, while he and Thompson were incarcerated together in May 2004, Thompson told him that he killed a girl who was "hot"

because "she [had] seen something she wasn't supposed to see," and that he (Thompson) "was supposed to [get] paid for it but he never got paid for it because he got locked up first."

6. We said in *Devonshire* that "a defendant who kills a potential witness, who is expected to give damaging testimony *against the killer* in some future proceeding, waives the right under the Confrontation Clause of the Sixth Amendment to object to the admission of that witness's out-of-court statements." 691 A.2d at 166 (italics added).

We reject both appellants' arguments. Even if we assume that, for purposes of the forfeiture-by-wrongdoing doctrine, Ward's role in a conspiracy to kill Hansen had to be proven by evidence other than a hearsay statement by Ward's alleged co-conspirator,[7] the record shows that the government provided other evidence that, we are satisfied, enabled the trial court to find by a preponderance of the evidence[8] that Thompson killed Hansen at Ward's behest. Among other things, Devin Evans testified to Ward's own admission (which is "not hearsay," Fed.R.Evid. 801(d)(2)(A)) that he sent Thompson and Ward's cousin "to kill the little girl" and that he "was supposed to pay ... Thompson 8,000 dollars," but "never paid him because he got locked up."

■ We reject Thompson's argument because we agree with other courts that the forfeiture-by-wrongdoing doctrine is not so limited in application that it overcomes the hearsay bar only where the murdered witness was to testify against her killer.[9] We discern no reason why the doctrine should not apply where, by a preponderance of the evidence, the trial court finds that a defendant procured a witness's death to benefit some *other* person. *Cf. United States v. Johnson*, 495 F.3d 951, 971 (8th Cir.2007) (concluding that the forfeiture-by-wrongdoing doctrine applied "even though [the defendant] had worked to procure the unavailability of potential witnesses against [her boyfriend] rather than against herself"). Thompson relies

on *Giles v. California*, 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), which he contends "spoke entirely of a defendant preventing a witness from giving testimony *against that same* defendant" (emphasis in Thompson's brief). We disagree with this characterization of *Giles*. The Court did observe that the "absence of a forfeiture rule ... would create an intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them," but the Court's overall discussion of the forfeiture-by-wrongdoing doctrine stressed instead the broader rule that under a "founding-era exception to the confrontation right," the common law excluded "unconfronted inculpatory testimony by murder victims (except testimony given with awareness of impending death)" unless "the defendant was on trial for killing the victim" and was "shown to have done so for the purpose of preventing testimony." *Id.* at 358, 365, 368, 128 S.Ct. 2678 (explaining that this history underlay the Court's approval of Fed.R.Evid. 804(b)(6), entitled "Forfeiture by wrongdoing," which "applies only when the defendant 'engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness'"). We also conclude that nothing this court said in *Devonshire* can fairly be read to imply that it is only where a murdered witness was expected to give damaging testimony against the killer that the killer waives his Confrontation Clause right to object to

---

7. *Cf. Butler v. United States*, 481 A.2d 431, 439 (D.C.1984) (agreeing with the rule that "judges may only consider independent evidence of the conspiracy in determining the admissibility of out of court statements [allegedly made by] coconspirators" during the course of a conspiracy); *but see Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) ("[A] court, in making a preliminary factual determination under [Fed.] Rule [of Evidence] 801(d)(2)(E),

may examine the hearsay statements sought to be admitted").

8. *See Gatlin v. United States*, 925 A.2d 594, 601 (D.C.2007).

9. The government asserts that Thompson did not preserve this objection. Because we reject it in any event, we need not pause over whether that assertion is correct.

admission of the witness's out-of-court statements.

■ Appellants further contend that the trial court erred in admitting Devin Evans's testimony about statements appellants made to Evans.[10] Thompson complains that the court erred in admitting against him Evans's testimony that, while incarcerated with Evans in 2005, Ward said that he sent Thompson "to kill the little girl" and that he "was supposed to pay ... Thompson 8,000 dollars." Thompson argues that the first part of this statement was not "self-inculpatory for Mr. Ward" and thus should not have been admitted against Thompson. To the contrary, far from shifting blame away from Ward, see United States v. Hammond, 681 A.2d 1140, 1145 (D.C.1996), the entire statement described Ward's (as well as Thompson's) role in a conspiracy to kill Hansen, and thus was a statement against Ward's penal interest.[11] Cf. United States v. Westmoreland, 240 F.3d 618, 627 (7th Cir.2001) ("[A] statement that implicates the declarant in a larger conspiracy tends to subject the declarant to criminal liability and thus is a statement against interest.").

■ Ward's challenge is to Evans's account of admissions Thompson made about killing Hansen (including the admission described in note 5 supra ) and Evans's account of statements that Evans attributed to Ward (i.e., that Ward "killed a little dude" who was selling PCP, that Ward sent Thompson and Ward's cousin to kill "the little girl," and that Ward asked Evans to make a telephone call for him to alert Ward's cousin that a witness (Holiday) was out of witness protection and back in the neighborhood and "to make sure she didn't make it to court"). Ward complains first that Thompson's statements against Thompson's penal interest were also considered as evidence against Ward, but the hearsay exception for statements against interest does not limit the use of such statements to use solely against the declarant.[12] Beyond that, the primary grounds for Ward's argument are assertions that Evans was heavily impeached, that Evans stood to gain favor from the government for his testimony, and that the circumstances under which Evans claimed to have heard statements from appellants were suspect. For those reasons, Ward argues, the trial court could not reasonably have found, from Evans's testimony, that "the declarant, in fact, made a statement" or that "corroborating circumstances clearly indicate[d] the trustworthiness of the statement." Laumer, 409 A.2d at 199.

■ Our review of the record indicates that the impeachment of Evans to which Ward points was as to minor matters (e.g., how many times he spoke to appellants).

---

10. As Ward concedes, appellants' statements to Evans were not testimonial. Thus, they were not subject to the Confrontation Clause. See Johnson v. United States, 17 A.3d 621, 627 (D.C.2011) (statements by which a witness relayed casual remarks her acquaintance Johnson made to her regarding the charged murder "were not testimonial and thus not subject to the strictures of the Sixth Amendment under Bruton [v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ]").

11. See Laumer v. United States, 409 A.2d 190, 199 (D.C.1979) (en banc) (adopting the statement against penal interest hearsay exception

described in Fed.R.Evid. 804(b)(3)). Whether a statement is against the declarant's penal interest is "clearly a legal question[,] that we review de novo." Bell v. United States, 950 A.2d 56, 64 (D.C.2008) (internal quotation marks omitted).

12. See Thomas v. United States, 978 A.2d 1211, 1230–31 (D.C.2009) ("Herndon's statement about Thomas was ... against Herndon's penal interest" and "therefore was substantively admissible against Thomas as well as against Herndon.").

In addition, the government represented that Evans neither sought nor was offered any benefit for his testimony. The trial court found no evidence that the government sent Evans to get information from appellants and no "adequate basis to suggest [that Evans was] lying" about what he heard, noting that Evans had testified consistently about his reasons for coming forward (saying that it was not right to kill a "little girl"), mentioned corroborative details (e.g., about the role of Ward's cousin, whom government witness Antwane Harrington also described as being near the scene of the Hansen shooting), and was "putting himself in danger not to tell the truth on these two guys." We discern no basis for disturbing the trial court's assessment, which it explained at length, that the statements Evans recounted were trustworthy.

## IV.

■■■ Claiming that they were prejudiced by having their trials joined, appellants contend that the trial court erred in joining the trials and abused its discretion when it denied their subsequent motions to sever. Joinder of defendants is appropriate in a number of circumstances, including where (as the trial court found in this case) "one offense leads logically to the other" and where "the offenses are part of a common scheme and are so closely connected in time and place that necessarily proof of the two crimes overlaps substantially." *Ray v. United States*, 472 A.2d 854, 858 (D.C.1984). Reviewing the issue *de novo, see Ball v. United States*, 26 A.3d

764, 767 (D.C.2011), we are satisfied that there was no misjoinder here. Notwithstanding the absence of evidence that Thompson was involved in Mario Evans's murder,[13] the court reasonably found that Ward's alleged murder of Evans, and Hansen's and Holiday's witnessing of the murder, directly led to the charged conspiracy between Ward and Thompson to prevent the two girls from testifying, and thus to appellants' efforts to obstruct justice, to Hansen's murder, and to the attempt to kill Holiday and the assault on White.

■■■ Nor did the trial court abuse its discretion in denying severance.[14] The court was required to balance "the possibility of [impermissible] prejudice to the defendants against the legitimate probative force of the evidence and the interest in judicial economy." *Bittle v. United States*, 410 A.2d 1383, 1386 (D.C.1980). "There can be no prejudice, however, if evidence of each offense is admissible in a separate trial for the other." *Byrd v. United States*, 502 A.2d 451, 452 (D.C. 1985). Here, trying the conspiracy, murder (of Hansen), obstruction, assault, and related weapons charges against each appellant in his separate trial would have entailed introducing the other appellant's statements and evidence of the other appellant's actions into evidence—just as happened in the trial that actually occurred—on the basis of the same hearsay exceptions that the trial court applied. We are not persuaded by Thompson's claim that he was unfairly prejudiced because the jury heard more details about the Mario Evans murder than a jury would

13. Under Super. Ct.Crim. R. 8(b), "all of the defendants need not be charged in each count" for defendants' trials to be joined.

14. Severance is required only when it is necessary to permit a defendant to have a fair trial. *See Void v. United States*, 631 A.2d 374, 379 (D.C.1993). The decision whether to sever cases is committed to the sound discretion

of the trial court, *see Bright v.. United States*, 698 A.2d 450, 454 (D.C.1997) (citation omitted), and this court will reverse the trial court's decision "only upon a clear showing that it has abused its considerable discretion." *Sterling v. United States*, 691 A.2d 126, 135 (D.C.1997) (internal quotation marks omitted).

likely have heard if Thompson had been tried separately.

## V.

■ Thompson argues that his convictions of both premeditated murder while armed and first-degree felony murder while armed are duplicitous, as are his convictions of three counts of PFCV, which he contends should merge because they "[arose] out of [his] uninterrupted possession of a single weapon during a single act of violence." *Matthews v. United States*, 892 A.2d 1100, 1106 (D.C.2006). The government acknowledges that, for each appellant, ·the conviction of premeditated murder of Hansen merges with the conviction for the first-degree felony murder of Hansen. As to the PFCV convictions, however, the government contends, and we agree, that only the PFCV convictions pertaining to Hansen's murder merge. The remaining PFCV conviction for each appellant, relating to the shooting of White, does not merge because the evidence showed that Thompson first entered the kitchen, where White was shot, and then went into the living room, where he shot Hansen at close range. There is no PFCV merger where a defendant separately aimed at and shot victims in different locations. *See, e.g., Diggs v. United States*, 28 A.3d at 602 n. 56.

## VI.

We remand to the trial court to vacate either the conviction for first-degree premeditated murder or the felony murder conviction as to Hansen, and to vacate the corresponding PFCV conviction, for each appellant. In all other respects, the judgment of the trial court is

*Affirmed.*