*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 10-CF-1184 & 10-CF-1232

EMANUEL JENKINS and AZARIAH ISRAEL, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF1-20178-08; CF1-15429-07)

(Hon. Michael Rankin, Trial Judge)

(Argued February 13, 2013                    Decided December 12, 2013)

*Abram J. Pafford* for appellant Emanuel Jenkins.

*Richard S. Stolker* for appellant Azariah Israel.

*Elizabeth H. Danello*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Deborah Sines*, and *Jennifer Kerkhoff*, Assistant United States Attorneys, were on the brief, for appellee.

*James Klein*, *Jaclyn S. Frankfurt*, and *Christine A. Monta* filed a brief on behalf of the Public Defender Service as *amicus curiae*.

Before GLICKMAN and OBERLY, *Associate Judges*, and REID, *Senior Judge*.

GLICKMAN, *Associate Judge*: Appellants Azariah Israel and Emanuel Jenkins were tried together before a jury for murders and other serious crimes committed in 2005 and 2006. The jury found Israel guilty on two counts of armed first-degree murder, three counts of armed assault with intent to kill, and related firearms charges, all in connection with a shooting of several individuals in Columbia Heights in December 2005. Israel also was found guilty, along with Jenkins, of conspiracy to obstruct justice and obstruction of justice in connection with the subsequent murder in August 2006 of a witness to the Columbia Heights shootings by the name of Charlie Evans. And though the jury hung on whether either appellant was guilty of Evans's murder itself, it convicted Jenkins of carrying a pistol without a license (CPWL) based on the evidence of his involvement in that crime.

Appellants present us with numerous claims of error in the conduct of their trial. Their weightiest challenges are to rulings admitting out-of-court statements by Jenkins and Evans under, respectively, the coconspirator and forfeiture-by-wrongdoing exceptions to the rule against hearsay. We conclude that error in the admission of Jenkins's statements against Israel requires us to reverse Israel's conviction for obstruction of justice. In addition, we must reverse Jenkins's

CPWL conviction for insufficient evidence. We affirm appellants' other convictions.

## I.

### A. The Murder of Charlie Evans

Appellants' trial revolved in large measure around the fate of Charlie Evans, a witness to the Columbia Heights shootings. Evans was last seen alive at around 11 p.m. on August 26, 2006, in the company of appellant Jenkins, and when Evans was shot and killed on Varnum Street in Northeast Washington three hours later, a vehicle linked by the government's investigation to Jenkins was observed leaving the scene.

The prosecution called three witnesses who saw Evans and Jenkins together on the eve of Evans's death. Macey Robertson, Paul Brown, and Vanessa Thomas testified that they were with Evans that night at a parking lot near 14th and Euclid Streets, Northwest, drinking and smoking marijuana, when Jenkins and another

man drove up in a red or burgundy SUV.[1]  Evans walked up to the SUV to speak with Jenkins.  As the parking lot was under surveillance, their meeting was captured on a videotape that was shown to the jury.  Jenkins exited the vehicle and he and Evans made plans to buy PCP.  While they were conferring, the SUV drove away.  Before Evans left the parking lot with Jenkins to procure the PCP, he told Brown he did not feel safe and did not want to go with Jenkins alone.  Brown was not interested in accompanying them, however, and eventually, at around 11 p.m., Evans and Jenkins left by themselves on foot.  Brown, Robertson and Thomas did not see Evans again.  A fourth government witness, Michael McNeill, testified that at around 2:00 that morning he heard squealing tires and a gunshot outside his house on Varnum Street.  Looking out, he saw a dark-colored SUV drive off.  McNeill went outside and found Charlie Evans's body lying in the street.

Investigators subsequently compared tire tracks left on Varnum Street with the tires on a burgundy-colored SUV belonging to Jenkins's parents.  An FBI examiner testified that one of the tires had tread design features that were

---

[1] The identity of Jenkins's companion was not established.  Brown testified at trial that the other man was Ronald Jenkins.  In the grand jury, however, he testified that the man was someone named "Jeremy."

consistent with these tracks. Jenkins's mother testified that Jenkins had access to this vehicle.

**B. The Columbia Road Shootings**

The government's theory at trial was that Jenkins killed Evans to prevent him from testifying about a previous shooting committed by Jenkins's cousin, appellant Israel. That incident took place on Columbia Road near 13th Street, Northwest, on the evening of December 9, 2005. The victims were a group of young men known as the "1-7 boys" (so-called because they came from the neighborhood around 17th Street, N.W.) who were "hang[ing] out" there at the time. One of the survivors, Cortez Blount, testified that Charlie Evans, whom he knew by the nicknames "Charlie Brown" and "Lamb Chop," arrived and "had words" with one of the group members. Two men, one with a tightly tied hoodie and one with a ski mask, arrived shortly afterward. Evans stepped away. Some pushing ensued and the man in the hoodie, whom Blount could not identify, started shooting at the 1-7 boys who had been talking with Evans. He killed two of them and wounded three, including Blount. Two months later, in February 2006, Detective Mitch Credle of the Metropolitan Police Department told Israel that he was the primary suspect in the shootings.

At appellants' trial, a government witness named George Haynes testified that Israel, in a conversation with him, had admitted having perpetrated the shootings on Columbia Road. As further proof of that fact, the government introduced evidence that Israel committed another murder a week earlier at a store on Chapin Street near 14th Street, N.W., with the same gun that was used in the Columbia Road shooting.[2] Israel's cousin Jeremy Johnson, whose presence during the Chapin Street shooting was confirmed by the store's surveillance tape, had testified before the grand jury that Israel was the shooter.[3] The trial court ruled the evidence of the uncharged Chapin Street murder admissible "on the issue of whether the shooter in the first case was the same shooter in the second case."

---

[2] A government firearms expert testified that cartridge casings recovered from the scenes of the Chapin Street and Columbia Road shootings had been expelled by the same gun.

[3] Johnson recanted this testimony at trial, claiming he was drunk and high when he gave it. Opining that Johnson looked "scared to death," the trial judge admonished the prosecution to let him know protection was available. Because Johnson took the stand at trial and was subject to cross-examination, his grand jury testimony was admissible against Israel. *See* D.C. Code § 14-102 (b)(1) ("A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition.").

## C. Hearsay Statements by Charlie Evans

Under the doctrine of forfeiture by wrongdoing, the court also permitted the prosecution to introduce a number of out-of-court statements made by Charlie Evans either under oath before the grand jury or in conversations with other government witnesses. The statements were admitted to prove not only that Israel committed the shootings on Columbia Road, but also Israel's and Jenkins's complicity in Evans's own murder.

In an appearance before the grand jury that subsequently indicted Israel, Evans testified that he was present at the scene of the Columbia Road shootings and knew who committed them. He identified the hooded man who suddenly opened fire on the 1-7 boys as Israel, whom Evans knew as a friend of his sister. Evans identified the man in the ski mask who accompanied Israel as Clifton Chaney, who was related to Israel. Immediately after the shootings, Evans testified, Israel confronted him and asked him if he had seen anything. Evans assured Israel he had not. Israel and others on his behalf later called Evans to arrange a meeting, which Evans avoided because he feared Israel wanted to kill him.

At trial, Evans's sister testified that Evans told her, too, that he had seen Israel commit the Columbia Road shootings. She also said Evans had expressed fear for his life because of his cooperation with the grand jury investigation. Paul Brown testified there had been rumors going around that Evans was "snitching." Evans told Macey Robertson he was anxious about these rumors and that Jenkins had accosted him in Adams Morgan and accused him of snitching on Israel.[4] Evans told another government witness, Niam Pannell, that Jenkins had pulled a gun on him.[5]

**D. Recorded Phone Conversations Between Israel and Others**

Finally, the government also relied at trial on a series of recorded phone calls made by Israel from the D.C. Jail (where he was being held following his arrest on an unrelated charge). The calls, which took place between March and August of 2006, were to Jenkins and others, including the aforementioned Clifton Chaney and his brother Pierre Chaney. The trial court ruled that statements in

---

[4] Evans also told Robertson he thought the 1-7 boys were after him for setting up the Columbia Road shootings.

[5] Pannell recounted this statement by Evans during an appearance before the grand jury. Like Johnson, Pannell sought at trial to disassociate himself from his grand jury testimony by claiming he was high at the time he gave it.

these calls were admissible in evidence pursuant to the coconspirator exception to the hearsay rule.

The participants on the phone calls, aware they were being recorded, spoke guardedly, in a sort of slang or code, about searching for and confronting someone they usually referred to as "Chizzie Brown," "Cazuz," "Cazuzzle," or a similar, transparently fake, variant on those monikers. In one conversation, though, Pierre Chaney, reported that "they've been missing that girl" and that he had "been trying to see if she been out there." Israel, confused, asked Pierre, "What girl?" to which Pierre responded "Charlie." The government contended that the speakers' statements showed they were looking for Charlie Evans (who, as Blount testified, was known as "Charlie Brown"[6]).

During one exchange on April 6, 2006, Israel asked Clifton Chaney whether he had "seen our man," and Clifton responded, "I don't know what you're saying." When Israel then said "Cazeez, uh, Cazuzzle," Chaney said he had seen him the previous day. Israel then told Chaney to "holler at, holler at my cousin," and Chaney replied, "I'm gonna holler at, holler at cuz then." The government argued

---

[6] Jeremy Johnson, before the grand jury, also testified that Evans was known as Charlie Brown.

that this exchange signified that Israel was asking Chaney to point out Evans to Jenkins (who did not know Evans).

In a conversation on July 10, 2006, Jenkins told Israel that he "had him . . . up in Adams Morgan." The government contended that this corroborated Evans's statement that Jenkins had caught up with him there and accused him of snitching on Israel. Finally, on Tuesday, August 22, Jenkins told Israel that he "had . . . Old Chizzie Brown," who (Jenkins stated) was "off that water."[7] In that same conversation, Jenkins said "every weekend it just gets sweeter and sweeter . . . . I'm telling you cuz, by this weekend. . . ." Jail records showed that Jenkins visited Israel three days later, on Friday, August 25, 2006. As previously mentioned, the evidence at trial showed that Jenkins found Charlie Evans late the following night, and that Evans was killed early Sunday morning. The government argued that Jenkins's statements on August 22 confirmed that he plotted with Israel to kill Evans that weekend.

---

[7] A witness testified that "off the water" was slang for being addicted to PCP.

## E. The Jury's Verdict

Based on the foregoing evidence, the jury considered a number of charges against appellants. In connection with the Columbia Road shootings, Israel was charged with two counts of first-degree murder, three counts of assault with intent to kill while armed, five counts of possession of a firearm during a crime of violence, one count of carrying a pistol without a license, and one count of unlawful possession of a firearm after conviction of a felony. In addition, both Israel and Jenkins were charged with the first-degree murder while armed of Evans, and Jenkins was charged with CPWL. Finally, each appellant also was charged with obstruction of justice and conspiracy to obstruct justice. The obstruction count alleged that Jenkins killed Evans because he provided information in the investigation of the Columbia Road shootings, and the alleged object of the conspiracy was to prevent Evans from assisting law enforcement and testifying against Israel in the investigation and prosecution of those shootings.

The jury deliberated for over a week, during which it sent several notes, one of which expressed uncertainty as to whether it had to find that Jenkins personally shot Evans in order to find him and Israel guilty of first-degree murder. (Recall that an unidentified second man was with Jenkins in the SUV when Jenkins found

Evans on the night of August 26, and that the government presented no eyewitness testimony specifically identifying Jenkins as the shooter.)  The trial court denied the government's request for a supplemental instruction on aiding and abetting and/or causation because doing so would introduce an alternative theory of liability in the middle of jury deliberations.  Consequently, the court told the jury that the government had to prove that Jenkins "actually discharged the firearm" himself. The jury eventually hung as to both appellants on the count of Evans's murder (and the government subsequently dismissed this murder charge).

The jury convicted appellants of all the other charges.  As to the charge of conspiracy to obstruct justice, the jury found four overt acts taken in furtherance of the conspiracy:  (1) Jenkins and Israel discussed preventing Evans from testifying against Israel; (2) Israel directed another person to point out Evans to Jenkins; (3) Jenkins located Evans on August 26, 2006; and (4) Jenkins persuaded Evans to leave with him that night.   Although it was charged as another overt act, the jury did not find that Jenkins shot Evans for the purpose of preventing him from testifying.

## F. Jenkins's Sentencing

The court sentenced both defendants later in 2010. Of relevance to this appeal is the court's decision to sentence Jenkins to 20 years' imprisonment for obstruction of justice.[8] While this was below the statutory maximum (30 years), it was above the presumptive range for obstruction of justice in the voluntary sentencing guidelines. The court explained that it chose to depart upward from the guidelines in view of what it found to be aggravating factors—in particular, that the obstruction was particularly egregious because it involved the murder of a witness, and that Evans was a particularly vulnerable victim due to his PCP addiction and other circumstances.

## II.

Appellants Jenkins and Israel present multiple claims of error in the trial court proceedings. We shall begin by addressing their objections to the admission of out-of-court statements pursuant to the coconspirator and forfeiture-by-

---

[8] The court imposed a five-year sentence on Israel for this offense.

wrongdoing exceptions to the rule against hearsay.[9]  We review the court's rulings

on admissibility for abuse of discretion; in so doing, we accept the factual findings

on which the rulings rest so long as they are not clearly erroneous, while we accord

*de novo* consideration to the legal issue of whether the hearsay exceptions were

available.[10]

---

[9]  Jenkins presents an additional hearsay argument that does not depend on the applicability of either of these exceptions.  He asserts that the government impermissibly elicited testimony from Detective Credle that Niam Pannell told him Jenkins had pulled a gun on Evans.  The introduction of Pannell's hearsay statement through Credle was harmless, however.  For one thing, it was cumulative, as Pannell's grand jury testimony that Jenkins had pulled a gun on Evans was already properly in evidence.  Moreover, while the indictment alleged Jenkins's display of a gun to Evans as an overt act in furtherance of the charged conspiracy, the jury did not find that overt act to have been proven.  In view of these facts, we are satisfied that the "judgment was not substantially swayed" by the error in admitting Pannell's hearsay statement to Credle.  *Kotteakos v. United States*, 328 U.S. 750, 746 (1946).

Israel as well presents an issue that we do not feel the need to address at length. Israel asserts that the trial court should have granted a mistrial after the prosecutor, referring in her opening statement to the persons slain on Columbia Road, commented that "a family buried two of their own."  Even viewing this as an inappropriate allusion to the suffering of the victims' family, it was an isolated and relatively mild remark.  We are confident it had no effect on the jury's verdict. Such brief irrelevant rhetoric is insufficient to warrant a mistrial, and the court did not abuse its discretion in denying one.

[10]  *See, e.g.*, *Smith v. United States*, 26 A.3d 248, 257 (D.C. 2011); *Roberson v. United States*, 961 A.2d 1092, 1097 (D.C. 2008).

## A. Coconspirator Hearsay

Both appellants challenge the introduction of parts of the recorded jail calls under the coconspirator hearsay exception. While the statements made by each defendant were admissible against that same defendant under the separate exception for party admissions,[11] the government invoked the coconspirator exception to introduce against each defendant statements made by the other declarants (including the co-defendant). Israel complains, primarily, of the admission of Jenkins's statements against him, while Jenkins mainly objects to the admission of Pierre Chaney's comments. The trial court admitted these statements without a limiting instruction under the coconspirator exception after finding that "the totality of the evidence proffered constitute[d] . . . fairly overwhelming evidence" of a conspiracy that included at least Israel, Jenkins, and Pierre Chaney.

An out-of-court statement is hearsay, and hence must come within an exception to the rule against hearsay to be admissible, if it is offered for the truth of

---

[11] *See Comford v. United States,* 947 A.2d 1181, 1185 (D.C. 2008) ("[O]ur cases continue to treat party-admissions as an exception to the rule against hearsay."); *Chaabi v. United States,* 544 A.2d 1247, 1248 n.1 (D.C. 1988) ("We have traditionally considered admissions to be exceptions to the hearsay rule.").

the matter asserted, but not if it is offered for another ("non-hearsay") purpose.[12]

As we shall see, the statements in the recorded phone calls were admissible as non-hearsay, insofar as they were, regardless of their truth, verbal acts probative of the existence of the conspiracy and the identity of its members. To that extent, the statements did not need to come within the coconspirator (or any) hearsay exception to be admitted in evidence. However, the trial court's ruling permitted the government to urge the jury to accept as true what the hearsay declarants asserted: specifically, that Jenkins and the Chaney brothers were out looking for Evans between March and August 2006; that Jenkins confronted him in Adams Morgan; and that Jenkins expected to find and confront Evans the weekend that Evans was killed. To the extent that the statements were thus introduced, at least in part, for their truth, we must consider whether the requirements of the coconspirator exception were satisfied.

---

[12] *Cox v. United States*, 898 A.2d 376, 380 (D.C. 2006) (Trial court erred in ruling that statements were inadmissible hearsay where "[a]ppellant sought admission of the statement not for the truth of what he said but for the fact that the statement was made."); *Carter v. United States*, 614 A.2d 542, 545 n.9 (D.C. 1992) ("[I]f a statement is not offered to prove the truth of the matter asserted, it is not hearsay."); Fed. R. Evid. 801 advisory committee note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.").

This court set forth the requirements in this jurisdiction for introducing hearsay statements made by alleged coconspirators in *Butler v. United States*.[13] In that case we adopted the exception contained in Federal Rule of Evidence 801 (d)(2)(e) and held that a coconspirator's out-of-court assertions may be admitted for their truth only if the judge finds it more likely than not that (1) a conspiracy existed, (2) the defendant had a connection with the conspiracy, and (3) the coconspirator made the statements during the course of and in furtherance of the conspiracy.[14] *Butler* also considered what evidence the judge is allowed to consider in making those findings—specifically, "whether all proffered evidence may be regarded, or whether only independent nonhearsay evidence may be considered" in determining the availability of the coconspirator exception.[15] The court found support for the latter view, under which the judge may not consider the alleged coconspirators' statements themselves, in the Supreme Court's decision in

---

[13] 481 A.2d 431 (D.C. 1984).

[14] *Id.* at 439-41.

[15] *Id.* at 439.

*Glasser v. United States*,[16] but that decision predated the Federal Rules of Evidence and (at the time of our decision in *Butler*) the federal circuit courts were divided over whether Federal Rule of Evidence 104 (a) overruled *Glasser* on this point.[17] Acknowledging the split of federal authority, we elected in *Butler*, "as a matter of state law, [to] adhere to the requirements of *Glasser*."[18] Accordingly, we held that, in determining the availability of the coconspirator exception, the judge is prohibited from considering the alleged coconspirators' statements themselves and

---

[16]  315 U.S. 60, 74-75 (1942) ("[S]uch declarations are admissible over the objection of an alleged co-conspirator, who was not present when they were made, only if there is proof aliunde that he is connected with the conspiracy. . . . Otherwise, hearsay would lift itself by its own bootstraps to the level of competent evidence."); *see also United States v. Nixon*, 418 U.S. 683, 701 (1974) ("Declarations by one defendant may also be admissible against other defendants upon a sufficient showing, by independent evidence, of a conspiracy among one or more other defendants and the declarant and if the declarations at issue were in furtherance of that conspiracy.").

[17]  *Butler*, 481 A.2d at 439.  Rule 104 (a) allows judges to consider hearsay and other inadmissible evidence in ruling on questions of admissibility.  Although this court has not "adopted" Rule 104 (a) in any formal sense, the principle it states is one we generally have followed outside the coconspirator hearsay context.  *See, e.g.*, *Roberson v. United States*, 961 A.2d 1092, 1096 & 1096 n.11 (D.C. 2008).

[18]  *Butler*, 481 A.2d at 440 n.14.

may rely "only" on "independent nonhearsay evidence."[19] We identified two policy reasons for choosing to retain this requirement derived from *Glasser*: (1) it "ensures the reliability of coconspirator's statements admitted at trial by determining that sufficient corroborating evidence of a conspiracy exists," and (2) it "guards against the danger of 'bootstrapping,' *i.e.*, using hearsay evidence to justify its own admission."[20]

Not long after *Butler* was decided, the Supreme Court resolved the split in federal authority. In *Bourjaily v. United States*, the Court held that Federal Rule of Evidence 104 (a) prevailed over *Glasser* and authorized federal judges deciding the admissibility of hearsay under the coconspirator exception to consider the hearsay itself along with other, independent evidence of the conspiracy.[21] Finding this

---

[19] *Id.* at 439-40 & 440 n.14. *Glasser*, it should be noted, did not require that a court consider only non-hearsay in ruling on the admissibility of coconspirator hearsay. The *Butler* court's rationale for adding this condition is not entirely clear. The court acknowledged that at least one federal circuit court had approved "consideration of all evidence, regardless of its hearsay nature, except the specific hearsay evidence for which admission is sought." *Butler*, 481 A.2d at 439 n.13 (citing *United States v. James*, 590 F.2d 575, 580-81 (5th Cir. 1979) (en banc)). The court rejected such a rule, saying only that it "presents a task more complicated than necessary for the trial judge without, in our view, compensating advantages." *Id.*

[20] *Id.* at 440 (citing *Glasser*, 315 U.S. at 74-75).

[21] 483 U.S. 171, 181 (1987).

result compelled by the clear language of the Rule, the Court dismissed the concern that it would "allow courts to admit hearsay statements without any credible proof of the conspiracy."[22] On the contrary, the Court had "little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy," especially if the statements are corroborated by other evidence.[23]

In the years since *Bourjaily* was decided, we have deferred consideration of its effect on our holding in *Butler*.[24] We are obliged to answer that question now, however, because it is, in part, outcome-determinative.[25]

We conclude that *Butler* remains controlling authority in the local courts of the District of Columbia. This conclusion is not to be understood as resulting from disagreement with *Bourjaily* or as expressing a preference for *Butler* over

---

[22] *Id.* at 179.

[23] *Id.* at 180.

[24] *See Ward v. United States*, 55 A.3d 840, 849 n.7 (D.C. 2012); *Bellanger v. United States*, 548 A.2d 501, 502 n.4 (D.C. 1988).

[25] Following oral argument, we directed the parties and invited the Public Defender Service as *amicus curiae* to argue the issue in supplemental briefing, which we have received.

*Bourjaily* on the merits. Rather, as a division of this court, we have no power to overrule *Butler*; only the court sitting en banc can do so.[26] The holding of *Butler* is, therefore, binding on us unless we determine that it has been overruled or, at a minimum, that its "philosophical basis" has been "substantially undermined" by subsequent decisions of the Supreme Court (i.e., by *Bourjaily*).[27]

Clearly, *Butler* has not been overruled. The Federal Rules of Evidence do not govern proceedings in the local courts of the District of Columbia (except to the extent that this court, on a case-by-case basis, has chosen or chooses in the future to adopt a specific Rule as local law). *Bourjaily*'s construction of Rule 104 (a)—a Rule we have not formally adopted, though it accurately states the rule of evidence we generally follow—therefore cannot be said to constitute an overruling

---

[26] *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) (holding that "no division of this court will overrule a prior decision of this court").

[27] *Frendak v. United States*, 408 A.2d 364, 379 n.27 (D.C. 1979) ("We do not believe . . . that *M.A.P. v. Ryan* . . . obliges us to follow, inflexibly, a ruling whose philosophical basis has been substantially undermined by subsequent Supreme Court decisions."); *see also Smith v. United States*, 984 A.2d 196, 200-01 (D.C. 2009).

of *Butler*'s "state law" holding.[28]  It likewise cannot be said that *Bourjaily* "substantially undermined" *Butler*'s "philosophical" underpinnings.  The *Butler* court made a deliberate decision to adopt an independent evidence requirement for proceedings in our local court system after considering the disparate views of the federal circuits and rejecting the position ultimately approved in *Bourjaily*.  We did so not with the goal of conforming to the Federal Rules of Evidence or federal law, but as a matter of local evidentiary policy to ensure the reliability of coconspirator hearsay introduced at trial and guard against the danger of "bootstrapping."  That *Bourjaily* recognized countervailing considerations and concluded that "[a] *per se* rule barring consideration of [coconspirator hearsay] during preliminary factfinding is not therefore required"[29] reinforces what we already knew:  that there are two sides to the issue. Perhaps it supports doubts about the rationale and wisdom of the policy choice made in *Butler*, as the government argues.  This is not enough, however, to undercut the substantial legitimacy of *Butler*'s policy decision in favor of an independent evidence requirement for the admission of coconspirator

---

[28]  While we often look to federal law for guidance, "this court is the final authority for establishing the evidentiary rules for the Superior Court of the District of Columbia."  *Laumer v. United States*, 409 A.2d 190, 195 n.7 (D.C. 1979) (en banc).

[29]  483 U.S. at 180.

hearsay—a requirement, we note, that courts in a number of other jurisdictions also have chosen to adopt.[30]

Applying *Butler*, therefore, to the present case, we are constrained to conclude that there was insufficient independent, non-hearsay evidence of the conspiracy to support the trial court's ruling. It is true, as the government argues, that there was independent, non-hearsay evidence that Evans witnessed the

---

[30] *Hillard v. State*, 53 So. 3d 165, 168 (Ala. Crim. App. 2010) ("In order for the extrajudicial statement of a coconspirator to qualify under the coconspirators' exception . . . the existence of the conspiracy must be shown by independent evidence."); *People v. Wolf*, 772 N.E.2d 1124, 1132 (N.Y. 2002) (According to New York law, determination that there was a conspiracy for the purposes of admitting coconspirator hearsay determination "must be made without recourse to the declarations sought to be introduced."); *State v. Batchelder*, 740 A.2d 1033, 1036 (N.H. 1999) (noting that New Hampshire law requires that existence of a conspiracy for the purpose of admitting coconspirator hearsay be demonstrated by independent evidence and "declin[ing] to consider whether [that rule] should be interpreted as the State suggests in accordance with *Bourjaily*."); *State v. Hansen*, 562 N.W.2d 840, 848 (Neb. 1997) ("[T]he rule is well established that before the trier of fact may consider testimony under the coconspirator exception to the hearsay rule, a prima facie case establishing the existence of the conspiracy must be shown by independent evidence."); *People v. Steidl*, 568 N.E.2d 837, 849 (Ill. 1991) (coconspirator statements "are admissible against all conspirators upon an independent, *prima facie* evidentiary showing of a conspiracy.") (emphasis in original); *State v. Clausell*, 580 A.2d 221, 241 (N.J. 1990) (Before admitting coconspirator statements a trial court must find that "a fair preponderance of evidence independent of the hearsay statements supports the existence of the conspiracy and of defendant's relationship to it.") (internal quotation marks omitted); *Romani v. State*, 542 So. 2d 984, 986 (Fla. 1989) (As a matter of state law, the Florida Supreme Court "decline[s] to adopt the federal approach laid out in *Bourjaily*.").

Columbia Road shootings; that he was rumored to be cooperating with the police; that Israel was told he was a suspect; that Jenkins was Israel's cousin and visited Israel at the D.C. Jail shortly before Evans was murdered; and that Jenkins was the last person seen with Evans, only three hours before the murder. Outside of the jail calls themselves, however, there is no substantial non-hearsay evidence that Jenkins plotted or contrived with Israel to kill Evans; no evidence, in other words, that there was a conspiracy involving Israel.

Whether and to what extent appellants were prejudiced by the erroneous admission of hearsay for its truth under the coconspirator exception, and hence are entitled to relief, is another question. In considering this question, we must take into account the fact that the statements at issue were relevant for a non-hearsay purpose, for which they did not have to meet *Butler*'s requirements to be admitted against each appellant.[31]

Statements between alleged coconspirators can be relevant wholly apart from their truth or falsity because the very act of plotting is itself compelling proof

---

[31] *See Walker v. United States*, 982 A.2d 723, 737 (D.C. 2009) (citing *Butler*, 481 A.2d at 438 n.10 (holding that a directive between coconspirators did not fall under the coconspirator hearsay rule as it was not introduced for its truth and so was not hearsay)).

of the existence of the conspiracy.[32] For this purpose, the veracity of the plotters' assertions is not the point; rather, the statements are non-hearsay verbal acts that manifest the conspiratorial agreement.[33] (Moreover, as the jury found in this case, the communications between conspirators also can constitute overt acts in furtherance of the conspiracy, and this is so without regard to whether they are true.) Israel's recorded plotting with Jenkins and the Chaneys thus was admissible simply to demonstrate that the four speakers were engaged in a conspiracy; and for

---

[32] *See, e.g.*, *United States v. Faulkner*, 439 F.3d 1221, 1226 (10th Cir. 2006) ("Statements by coconspirators are commonly introduced at trial simply because the statements themselves are part of the plotting to commit a crime."); citing *United States v. Lim*, 984 F.2d 331, 336 (9th Cir. 1993); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1075 (2d Cir. 1988); *United States v. Hamilton*, 689 F.2d 1262, 1270 n.4 (6th Cir. 1982); *United States v. Burke*, 495 F.2d 1226, 1232 (5th Cir. 1974). *See also People v. Caban*, 833 N.E.2d 213, 217-18 (N.Y. 2005) (statements of agreement and planning are relevant even if untrue, for the mere fact that they were uttered is relevant to prove a conspiracy); *State v. Henry*, 752 A.2d 40, 46-47 (Conn. 2000) (statement between defendant and coconspirator that they would shoot victim was not admitted for truth but to show conspiratorial agreement); *Commonwealth v. McLaughlin*, 726 N.E.2d 959, 964 (Mass. 2000); *State v. Ross*, 573 N.W.2d 906, 916 (Iowa 1998); *State v. Lobato*, 603 So. 2d 739, 746 (La. 1992); *State v. Brooks*, 655 P.2d 99, 106-07 (Idaho 1982).

[33] *Puma v. Sullivan*, 746 A.2d 871, 876 (D.C. 2000) ("Although the statement was made by an out-of-court declarant, it is not hearsay, because Ewoldt's offer is not an assertion; it is a verbal act. In other words, the offer is non-hearsay under the general definition, because it is not being used for the truth of the matter it asserts; it simply is being used to prove Ewoldt spoke the words of an offer."); *see also* David S. Davenport, *The Confrontation Clause and the Co-conspirator Exception in Criminal Prosecutions: A Functional Analysis*, 85 HARV. L. REV. 1378, 1398-99 (1972).

that purpose it makes no difference whether, for example, Jenkins was telling the truth or lying when he said he had been looking for Evans, had found him in Adams Morgan, and expected to catch him again over the coming weekend. Thus, despite the *Butler* error, it was permissible for the jury to consider the recorded statements as non-hearsay proof of the existence of the alleged conspiracy without regard to the truth of the statements.[34]

Consequently, the focus of our harmlessness inquiry is narrowed. Neither Israel nor Jenkins can claim to have been prejudiced by the *Butler* error unless the jury may have relied on the truth of another putative conspirator's statements in finding him guilty on a particular count. We readily rule out that possibility with respect to Israel's convictions of the charges relating to the shootings on Columbia Road. Even assuming that the recorded statements evidencing Israel's involvement in a conspiracy to eliminate a witness helped prove Israel's commission of the Columbia Road shootings by revealing his consciousness of

---

[34] It may seem paradoxical that conspirators' statements are admissible as non-hearsay to prove the existence of the conspiracy to the jury, but simultaneously may not be considered by the judge for purposes of the coconspirator exception. But that is the import of *Butler*'s independent evidence requirement. *See Caban*, 833 N.E.2d at 217-19 (holding conspirators' statements admissible as verbal acts to prove existence of conspiracy but not, absent independent evidence of the conspiracy, for their truth).

guilt, this probative value depended only on the fact of the plotting, not on the truth of anything Israel's fellow plotters said to him. Similarly, we see no reason to suppose that the jury relied on the truth of the conspirators' statements in convicting appellants of conspiracy to obstruct justice. The existence of the conspiratorial agreement and the four overt acts found by the jury were proved by non-hearsay evidence—the conspirators' recorded statements, considered simply as verbal acts manifesting the conspiracy, and the eyewitness testimony of the witnesses who were present when Jenkins and Evans met at the parking lot shortly before Evans was killed.[35]

That leaves the obstruction of justice count. We conclude that the *Butler* error was harmless with respect to Jenkins's conviction on that count. Jenkins complains only about the admission of Pierre Chaney's statements to the effect that "they" had been looking for "that girl," whom Chaney called "Charlie."[36] In view

---

[35] So, too, we are confident that the jury did not rely on coconspirator hearsay to convict Jenkins of CPWL; however, as we discuss below, we reverse his conviction of that offense on other grounds, namely, the insufficiency of the government's proof.

[36] Jenkins does not object to the admission against him of anything said by Israel. Israel's comments during the calls were minimally probative of Jenkins's guilt. This is not surprising, as Israel knew all his calls were being recorded. Israel demonstrated his keen awareness of this when, at one point, he warned Jenkins not to "even talk on the phones, you hear me."

of Jenkins's own recorded statements implicating himself in the conspiracy and the other substantial evidence of his involvement in Evans's murder, we are confident that the admission of Chaney's statements did not "substantially sway" the jury's verdict that Jenkins obstructed justice by killing Evans.[37]

We reach a different conclusion with respect to Israel's conviction for obstruction of justice. Under the principle that a conspirator is liable for crimes committed by his coconspirators in furtherance of the conspiracy,[38] the verdict against Israel on the obstruction count rested, in part, on the evidence the jury relied on to convict Jenkins of obstruction. That evidence may have included Jenkins's recorded hearsay statements, considered by the jury for their truth. We are not prepared to discount the importance of Jenkins's incriminating hearsay to the jury's finding that he, and hence Israel, obstructed justice. We therefore cannot find the *Butler* error harmless with respect to Israel's conviction for that offense.

---

[37] *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

[38] *See Wilson-Bey v. United States*, 903 A.2d 818, 840 (D.C. 2006) (en banc) ("[A] co-conspirator who does not directly commit a substantive offense may nevertheless be held liable for that offense if it was committed by another co-conspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement.") (internal quotation marks omitted).

## B. Forfeiture by Wrongdoing

Israel and Jenkins also challenge the admission of the out-of-court statements of Evans pursuant to the forfeiture-by-wrongdoing doctrine. Under that doctrine, "a defendant forfeits his Sixth Amendment right to be confronted by a witness against him, as well as his objection to the introduction of hearsay, if he wrongfully procured the unavailability of that witness with the purpose of preventing the witness from testifying."[39] Moreover, "if the defendant conspired with another to prevent the witness from testifying, forfeiture ensues whether it was the defendant himself or another co-conspirator who made the witness unavailable—so long as the actor's misconduct 'was within the scope of the conspiracy and reasonably foreseeable to the defendant.'"[40] To invoke the doctrine successfully, "'the government need only establish the predicate facts [to the trial judge's satisfaction] by a preponderance of the evidence.'"[41]

---

[39] *Roberson v. United States*, 961 A.2d 1092, 1095 (D.C. 2008) (citing *Giles v. California*, 554 U.S. 353, 366 (2008), and *Devonshire v. United States*, 691 A.2d 165, 168-69 (D.C. 1997)).

[40] *Roberson*, 961 A.2d at 1095 (quoting *United States v. Carson*, 455 F.3d 336, 364 (D.C. Cir. 2006)); *see also Gatlin v. United States*, 925 A.2d 594, 599-600 (D.C. 2007) (applying coconspirator liability principles in conjunction with the forfeiture-by-wrongdoing doctrine).

[41] *Roberson*, 961 A.2d at 1095-96 (quoting *Devonshire*, 691 A.2d at 169).

The trial court admitted Evans's hearsay statements under the forfeiture doctrine after finding it more likely than not that Jenkins procured Evans's absence in furtherance of appellants' conspiracy to render him unavailable to testify against Israel. Appellants contend that the court violated the evidentiary restrictions adopted in *Butler* by basing its finding of such a conspiracy, in part, on the recorded jail calls and on the substance of Evans's hearsay statements. We conclude that the court had a proper and sufficient basis to admit Evans's statements under the forfeiture-by-wrongdoing doctrine.

The argument that the court should not have relied on the jail calls because they were not admissible as coconspirator hearsay under *Butler* is pressed by Israel. In our view, he doubly misapprehends our decision in that case. First, even if we posit that the court was precluded from considering the out-of-court statements in the calls for their truth, *Butler* did not prevent the court from making legitimate non-hearsay use of those statements—just as it did not prevent the jury from doing so, as we have held. For the purpose of determining the admissibility of Evans's statements under the forfeiture-by-wrongdoing exception, the court was

allowed to rely on the jail calls as verbal acts manifesting appellants' involvement in a conspiracy to silence Evans.[42]

In view of that conclusion, if the trial court considered any of the recorded statements for their truth in ruling on the availability of the forfeiture exception, we think it would have been harmless error at worst. But we are not persuaded it would have been error at all. As a general proposition, a trial court is permitted to rely on hearsay (whether or not it falls within a recognized exception) in ruling on the admissibility of evidence, "even where (as in this case) the question concerns the defendant's constitutional rights."[43] *Butler* carved out a narrow exception to

---

[42] To be sure, as previously discussed, *Butler*'s independent evidence requirement barred the trial court from relying in any way on statements in the jail calls in determining whether those statements themselves were admissible as coconspirator hearsay. But the court's consideration of the jail calls in ruling on the admissibility of Evans's statements did not violate the independent evidence requirement—the jail calls *were* independent of Evans's statements.

[43] *Roberson*, 961 A.2d at 1096 (citing, *inter alia*, *United States v. Matlock*, 415 U.S. 164, 172-75 (1974), and *Fleming v. United States*, 923 A.2d 830, 835 (D.C. 2007)). As the Supreme Court pointed out in *Bourjaily*, allowing consideration of hearsay in rulings on admissibility of evidence is justified by "two simple facts of evidentiary life":

> First, out-of-court statements are only *presumed*
> unreliable. The presumption may be rebutted by
> appropriate proof . . . . Second, individual pieces of
> evidence, insufficient in themselves to prove a point, may
> in cumulation prove it. The sum of an evidentiary

*(continued…)*

this principle that was limited to rulings on the admissibility of coconspirator hearsay. We see no reason to think the court intended the exception to apply more broadly, and, indeed, we are not aware that *Butler*'s ban on considering even independent hearsay has been expanded to govern rulings on the admissibility of evidence in any other context.[44] We do not see any justification for imposing such a ban here.

Appellants' second objection is that relying on Evans's own statements to support a finding of forfeiture by wrongdoing amounted to the kind of "bootstrapping"—using hearsay to justify its own admission—that concerned the *Butler* court in the context of coconspirator hearsay. We are not persuaded,

---

*(continued…)*

> presentation may well be greater than its constituent parts. Taken together, these two propositions demonstrate that a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence. A *per se* rule barring consideration of these hearsay statements during preliminary factfinding is not therefore required.

483 U.S. at 179-80.

[44] Similarly, we are not aware that any other jurisdiction that requires coconspirator hearsay to be supported by independent evidence of the conspiracy, see, e.g., footnote 30, *supra*, has insisted that only non-hearsay evidence may be considered.

however, that the concern about bootstrapping mandates application of *Butler*'s logic to cases involving the doctrine of forfeiture by wrongdoing. Generally speaking, it is appropriate and common for judges to consider the substance of proffered hearsay together with independent evidence in determining whether a hearsay exception is available;[45] and this court has implicitly approved such consideration in its forfeiture-by-wrongdoing cases.[46] Courts in other jurisdictions

---

[45] *See e.g.*, *Hallums v. United States*, 841 A.2d 1270, 1276 (D.C. 2004) (considering the content of the hearsay statement in deciding whether it is admissible under the exception for present sense impressions); *Jenkins v. United States*, 617 A.2d 529, 530 (D.C. 1992) (same for dying declaration exception to the rule against hearsay); *Durant v. United States*, 551 A.2d 1318, 1324 (D.C. 1988) (same for business records exception to the rule against hearsay); *Watts v. Smith*, 226 A.2d 160, 162-63 (D.C. 1967) (same for excited utterance exception to the rule against hearsay).

[46] *See e.g.*, *Crutchfield v. United States*, 779 A.2d 307, 327 (D.C. 2001) (upholding applicability of forfeiture doctrine when the trial court assessed the missing witness's testimony as well as substantial independent evidence to determine that the witness's testimony was admissible); *Devonshire v. United States*, 691 A.2d 165, 167 (D.C. 1997) (same).

have done likewise.[47] There are good reasons to allow it, as discussed in *Bourjaily*,[48] and we perceive no principled reason to forbid it *per se*.

In the case now before us, the trial court did not rest its finding of a forfeiture by wrongdoing solely on the statements of the missing witness. Rather, and appropriately, the court considered those statements in conjunction with other, independent evidence indicating that appellants conspired to render the witness unavailable to preclude him from testifying.[49] We hold that the court did not err by

---

[47] *See Davis v. Washington,* 547 U.S. 813, 833 (2006) ("Moreover, if a hearing on forfeiture is required, [The Supreme Judicial Court of Massachusetts], for instance, observed that 'hearsay evidence, including the unavailable witness's out-of-court statements, may be considered.'") (citing *Commonwealth v. Edwards*, 830 N.E.2d 158, 174 (Mass. 2005)); *Vasquez v. People*, 173 P.3d 1099, 1105 (Colo. 2007) ("Because the defendant's possible forfeiture of his confrontation rights is a preliminary question going to the admissibility of evidence . . . the determination shall not be bound by the rules of evidence except those with respect to privileges. Thus hearsay evidence, including the unavailable witness's out-of-court statements, will be admissible."); *People v. Stechly*, 870 N.E.2d 333, 353 (Ill. 2007) (citing *Davis* for the proposition that hearsay evidence can be used to justify its own admission in the forfeiture-by-wrongdoing context); *see also* Aaron R. Petty, *Proving Forfeiture and Bootstrapping Testimony After Crawford*, 43 WILLAMETTE L. REV. 593, 615-16 (2007) ("Other courts have not found independent evidence necessary for a finding of forfeiture.").

[48] See footnote 43, *supra*.

[49] Thus, we are not presented with an instance of "pure" bootstrapping in which the testimony of the missing witness is the *only* evidence supporting forfeiture, and we do not hold that such "pure" bootstrapping would be appropriate.

considering Evans's out-of-court statements in determining whether appellants forfeited their Confrontation Clause and hearsay objections to their introduction at trial.

Accordingly, we review the court's factual finding that appellants procured Evans's unavailability to prevent him from testifying for clear error and its ultimate decision to admit Evans's statements for abuse of discretion. The finding that Jenkins and Israel conspired with the specific intent to prevent Evans from testifying was not clearly erroneous. There was ample evidence, including the recorded jail calls and Jenkins's actions on the night Evans was last seen, that appellants conspired to kill Evans. As to their purpose, Evans's statement to Robertson that Jenkins had confronted him in Adams Morgan about snitching on Israel, in conjunction with Israel's awareness (after speaking with Detective Credle) that he was the main suspect in the Columbia Road shootings and the testimony that Evans was present during the shootings and had identified Israel, furnished a sufficient evidentiary basis for the court to find it more likely than not that appellants intended to prevent Evans from testifying against Israel. No other motive on their part for killing Evans was adduced. Finally, the evidence supported a finding by a preponderance that it was Jenkins who was the cause of Evans's absence: By his own admission Jenkins was tracking "Old Chizzie

Brown" (a/k/a Charlie Evans); he found Evans and went off with him only three hours before Evans was killed; he was the person who was last seen with Evans; his parents' SUV matched the description given by an eyewitness of the vehicle that left the scene of Evans's murder; and expert testimony established that one of the tires on the SUV could have left the tire print found at the scene. We conclude that the court did not abuse its discretion in admitting Evans's testimony under the forfeiture-by-wrongdoing doctrine.

Jenkins makes the further argument, however, that where, as here, the defendant is on trial for killing the declarant, the judge's preliminary finding of the defendant's guilt for purposes of applying the forfeiture-by-wrongdoing doctrine violates due process by undermining the presumption of innocence and the judge's objectivity. We do not agree. The equitable rationale of the forfeiture doctrine is no less compelling when the issue is whether to admit hearsay statements of the person whom the defendant is accused of having murdered to prevent his testimony, and past decisions of this court and other courts have sanctioned

application of the forfeiture doctrine in just such circumstances.[50] This does not threaten the integrity of the trial. Judges often make preliminary determinations that involve an assessment of the strength of the case against the defendant before the ultimate issue is decided. They do so, for example, in ruling on the admissibility of coconspirator hearsay in conspiracy cases and when deciding whether to release a defendant prior to trial. These determinations neither prevent the judge from presiding impartially over the case[51] nor shift the burden of proof to the defense; the prosecution retains the burden of proving the defendant's guilt

---

[50] See *Devonshire v. United States*, 691 A.2d 165, 166-68 (D.C. 1997); *see also, e.g.*, *Giles v. California*, 554 U.S. 353, 374 n.6 (2008) (Scalia, J. concurring) ("We do not say, of course, that a judge can never be allowed to inquire into guilt of the charged offense in order to make a preliminary evidentiary ruling. That must sometimes be done under the forfeiture rule that we adopt—when, for example, the defendant is on trial for murdering a witness in order to prevent his testimony."); *State v. Meeks*, 88 P.3d 789, 794 (Kan. 2004) ("If the trial court determines as a threshold matter that the reason the victim cannot testify at trial is that the accused murdered her, then the accused should be deemed to have forfeited the confrontation right, even though the act with which the accused is charged is the same as the one by which he allegedly rendered the witness unavailable.") (internal quotation marks omitted), *overruled on other grounds by State v. Davis*, 158 P.3d 317 (Kan. 2006).

[51] *In re Evans*, 411 A.2d 984, 995 (D.C. 1980) (bias does not result from a "judicial determination derived from evidence and lengthy proceedings before the court."); *see also, e.g.*, *United States v. Lentz*, 524 F.3d 501, 530-31 (4th Cir. 2008) (holding that, in determining that the defendant had procured the victim's death and thereby forfeited his objections to the admission of her statements, the "court, using a preponderance of the evidence standard, made the necessary factual findings to determine the evidentiary question before it and, in doing so, did not exhibit such 'favoritism' or antagonism as to make fair judgment impossible").

beyond a reasonable doubt.[52]  Therefore, we reject Jenkins's contention that the forfeiture doctrine is used improperly when its application requires the judge to make a threshold determination regarding the defendant's culpability for the crime for which he stands trial.

## C. Evidence of the Chapin Street Shooting

Israel claims that the trial court abused its discretion[53] in admitting the evidence of his involvement in the uncharged Chapin Street murder; he argues that this was impermissible propensity evidence and that it was significantly more prejudicial than probative.  We conclude that this evidence was properly admitted and used for the limited purposes of proving the identity of the perpetrator of the Columbia Road shootings and establishing that Israel was in possession of the weapon used in those shootings.

---

[52]  *See also People v. Giles*, 152 P.3d 433, 445 (Cal. 2007) ("The presumption of innocence and right to jury trial will not be infringed [by a determination that the forfeiture doctrine applies] because the jury 'will never learn of the judge's preliminary finding' and 'will use different information and a different standard of proof to decide the defendant's guilt.'"), *vacated on other grounds sub nom. Giles v. California*, 554 U.S. 353 (2008).

[53]  *See Jones v. United States*, 27 A.3d 1130, 1143 (D.C. 2011).

While evidence of an uncharged crime is inadmissible for the purpose of proving the defendant's criminal disposition, it may be admissible when offered for some "substantial, legitimate purpose."[54] Proof of identity, where the identity of the perpetrator of the charged offense is in dispute, is one such non-propensity purpose.[55] Other crimes evidence may be probative of identity where there exists "a reasonable probability that the same person committed both crimes due to the concurrence of unusual and distinctive facts relating to the manner in which the crimes were committed."[56] We have held that this may be shown by evidence that the same weapon or other instrumentality was used in both crimes.[57] In addition, as pointed out in *Jones*, proof that the defendant possessed the weapon (or instrumentality) in question may be admissible on the related, but distinct, ground that it is "direct evidence" of the defendant's complicity in the offense for which

---

[54] *Drew v. United States*, 331 F.2d 85, 89-90 (D.C. Cir. 1964).

[55] *Jones*, 27 A.3d at 1143.

[56] *Drew,* 331 F.2d at 90 & n.11.

[57] *See Jones*, 27 A.3d at 1145-47 (D.C. 2011) (upholding admission in prosecution for murder of evidence that the defendant committed an uncharged armed robbery in which the murder weapon was employed).

he is on trial.[58] The special procedural requirements that ordinarily must be met for the admission of other crimes evidence under *Drew*, such as the requirement that the uncharged offense be proved by clear and convincing evidence, do not apply to such direct evidence of the defendant's guilt.[59] The court still may exclude the evidence, though, if it finds that its probative value is outweighed substantially by the risk of unfair prejudice.[60]

In this case, ballistics evidence established that the gun used in the shootings on Columbia Road was used just eight days earlier in the shooting on Chapin Street. There was a single attacker in each incident. From the fact that the same weapon was used in two such events so close in time, a reasonable trier of fact could infer that the same person was the shooter in both of them. The government's evidence—the strength of which is not challenged in this appeal—that Israel was the shooter on Chapin Street therefore was admissible under the

---

[58] *Id.* at 1146 (citing *Busey v. United States*, 747 A.2d 1153, 1165 (D.C. 2000)); *see also Johnson v. United States*, 683 A.2d 1087, 1096-97 (D.C. 1996) (en banc).

[59] *Jones*, 27 A.3d at 1146-47; *see Johnson*, 683 A.2d at 1098 (stating that "*Drew* does not apply" to other crimes evidence that is, *inter alia,* "direct and substantial proof of the charged crime").

[60] *Jones*, 27 A.3d at 1147; *see generally Johnson*, 683 A.2d at 1098-1100.

twin rationales that it was probative of Israel's identity as the perpetrator of the Columbia Road shootings and direct evidence that Israel possessed the murder weapon and was guilty of the crimes for which he was on trial.

Whether the danger of unfair prejudice to Israel from introducing the uncharged Chapin Street murder substantially outweighed its probative value was a question committed to the discretion of the trial court, "and we owe a great degree of deference to its decision."[61] We cannot conclude that the court abused that discretion. Evidence of an uncharged murder undeniably has a prejudicial impact, but *unfair* prejudice is minimized where the evidence is admitted for a valid purpose and has substantial probative value, the prosecution does not present or argue it improperly, and the court correctly instructs the jury on the permissible use it may make of the evidence. Those conditions were satisfied here. Israel's claim that the government exploited the evidence to prejudice the jury against him is not supported by the record. The prosecutor took care not to invite improper propensity implications, but rather highlighted the legitimate identity inferences, arguing that the same murder weapon was used only a week before the second shooting in the same manner, and that "those similarities . . . prove[] to you that

---

[61] *Johnson*, 683 A.2d at 1095.

it's the same shooter." The trial court instructed the jury that it could use the Chapin Street evidence only for its value as proof of identity, and not for any other purpose, such as "to conclude that Mr. Israel has a bad character or criminal propensity." On the record before us, we do not find undue prejudice.

## D. Interpretation of Jail Calls

Jenkins makes various claims related to the government's use and interpretation of the recorded jail phone calls. He complains of the court's refusal to require the government to disclose its "translations" of the calls prior to trial and argues that the court erred in allowing lay witnesses and the prosecutor to interpret the calls in the absence of expert testimony as to the meaning of what was said in them.

Prior to trial, Jenkins filed a "decoding motion" requesting that the government be ordered to disclose in advance of trial how it interpreted the opaque language used in the jail calls. The trial court denied the motion on the ground that there was no law or rule requiring the government to provide such information in discovery. We agree with that ruling. What appellant calls the government's interpretation of the conversations (most of which involved Jenkins himself) was

not exculpatory evidence,[62] nor was it contained in any discoverable document[63] or the anticipated testimony of any expert witness.[64] It was, essentially, prosecution work product—the government's view as to the permissible inferences to be drawn from conversation—which Criminal Rule 16 (a)(2) specifically exempts from discovery.[65] We therefore reject Jenkins's discovery argument.

At trial, the government presented lay witness testimony bearing on the meaning of certain words and phrases spoken in the jail calls. Notably, this included Vanessa Thomas's testimony that the phrase "off the water" (which Jenkins used to describe "Old Chizzie Brown") referred to smoking or being

---

[62] *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[63] *See* Super. Ct. Crim. R. 16 (a)(1)(C), (D).

[64] *See id.* R. 16 (a)(1)(E).

[65] Super. Ct. Crim. R. 16 (a)(2) ("Except as provided in subparagraphs (a)(1)(A), (B), (D), and (E), this Rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or any other government agent investigating or prosecuting the case.").

addicted to PCP.[66]  It was no abuse of discretion to admit this testimony.  A lay witness with personal knowledge about particular slang properly may testify to its meaning.[67]  As we have explained, when "the reasoning process . . . employed to interpret the street language was the everyday process of language acquisition" as opposed to "special training or scientific or other specialized or professional knowledge," opinion testimony explaining such language does not veer impermissibly into expert testimony.[68]  There is no question that the witnesses in this case who "translated" the jail call slang were personally acquainted with appellants or Evans and were members of the milieu in which the slang was used.  Thomas, in particular, testified that she was familiar with the use of PCP in her community and had personal knowledge from her daily life that "off the water"

---

[66]  Jenkins also argues that it was improper for George Haynes to testify to the meaning of "I need some ink," "hammer," and "I got to get on top of that." Insofar as Jenkins is concerned, this testimony was tangential and innocuous.  The statements about "ink," which Haynes testified meant money, and "hammer," which he testified meant a gun, were not relevant to the charges of conspiracy or obstruction, and the prosecutor did not mention either term in closing.  "I got to get on top of that" was a comment made by Pierre Chaney.  Its meaning was obvious; Haynes's exegesis ("You got to take care of something") added nothing.

[67]  *See United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011).

[68]  *King v. United States*, 74 A.3d 678, 682-83 (D.C. 2013).

referred to PCP use or addiction.[69]

Lastly, in closing argument the prosecutor argued that the jail calls manifested appellants' conspiracy to eliminate Evans. In particular, the prosecutor urged the jury to infer that Evans was the person whom the speakers referred to as "Chizzie Brown" and similar names. We do not agree with Jenkins that the prosecutor thereby presented herself as an expert or argued inferences without foundation in the record. In closing argument, a prosecutor may make "reasonable comments on the evidence and may draw inferences that support the government's theory of the case" so long as those inferences are not "unsupported by the evidence."[70] This is so even though the evidence may be ambiguous. In *Mason v. United States*, for example, we acknowledged that the defendant's recorded phone calls from the jail "appeared to have been quite cryptic" and that their "probative value [was] not readily apparent."[71] The government and the defense disagreed as to what the conversations meant and whether they were inculpatory. Nonetheless,

---

[69] Similarly, Haynes testified that he and Israel had employed code words during phone conversations they knew to be recorded, and that he was familiar with Israel's vernacular.

[70] *Lewis v. United States*, 996 A.2d 824, 832 (D.C. 2010).

[71] 53 A.3d 1084, 1100 (D.C. 2012) (internal quotation marks omitted).

we held that because "[t]he government offered the jury plausible interpretations of the calls," the trial court did not abuse its discretion in determining that "the resolution of these ambiguities was best left for the jury."[72]

Here, too, while the phone calls may have been ambiguous, there was a sufficient evidentiary basis to support the government's interpretation. That Jenkins meant Evans when he spoke of "Chizzie Brown" who was "off that water" was supported, for example, by (1) the testimony that Evans was known as "Charlie Brown," (2) Vanessa Thomas's explication that "off the water" referred to PCP use or addiction, and (3) the testimony of Evans's friends that he was addicted to PCP and last seen going to buy it with Jenkins. The identification was further corroborated by Jenkins's statement that he "had him . . . up in Adams Morgan" and Macey Robertson's testimony that Evans told her he had been confronted by Jenkins there; and by Jenkins's assurance to Israel about "this weekend" just before the weekend Evans was killed. In light of this and other evidence, the prosecutor did not present herself as an expert on slang, but simply argued the permissible inferences.

---

[72] *Id.*

## E. Joinder and Severance

Israel argues that the charges relating to the shootings on Columbia Road were misjoined under Criminal Rule 8 (b)[73] with the charges relating to Evans's murder, and that the court abused its discretion under Criminal Rule 14[74] by refusing to sever his trial from that of Jenkins because their defenses were irreconcilable.[75] Neither claim has merit. The joinder was proper under Rule 8 (b) because the charged offenses bore a sequential relationship to each other—Evans was allegedly murdered to silence him and obstruct justice because he had witnessed Israel commit the Columbia Road shootings.[76] Indeed, even if the two sets of charges had been tried separately, evidence of each would have been

---

[73] Super. Ct. Crim. R. 8 (b).

[74] Super. Ct. Crim. R. 14.

[75] Israel does not pursue on appeal the argument he made in the trial court that he was prejudiced because the joint trial prevented him from calling Jenkins as a witness to testify on his behalf.

[76] *See Ward v. United States*, 55 A.3d 840, 851 (D.C. 2012); *Ball v. United States*, 26 A.3d 764, 767-68 (D.C. 2011).

relevant and admissible in a trial of the other.[77] And appellants' defenses were not in conflict; each appellant claimed he had nothing to do with any of the crimes and neither blamed nor contradicted the other.[78]

## F. Sufficiency of the Evidence

Jenkins argues that the evidence was insufficient to sustain his convictions for conspiracy, obstruction of justice, and CPWL. Viewing the evidence, as we must, in the light most favorable to upholding the jury's verdict,[79] we agree only to the extent that we find there was insufficient evidence to convict Jenkins of CPWL.

---

[77] The evidence of Israel's commission of the shootings on Columbia Road would have been probative of his motive to kill Evans and render him unavailable to testify against him, and the evidence of Israel's participation in the conspiracy to kill Evans would have been relevant to show consciousness of guilt with respect to the Columbia Road incident. *See Ford v. United States*, 647 A.2d 1181, 1184 n.5 (D.C. 1994) ("[E]vidence of each joined offense would be admissible in a separate trial of the other" when the evidence "reflect[s] consciousness of guilt about the other charges."); *Hazel v. United States*, 599 A.2d 38, 42 (D.C. 1991) (evidence of the other crimes properly admitted under the motive exception to *Drew*).

[78] *See McCoy v. United States*, 760 A.2d 164, 185 n.28 & n.29 (D.C. 2000).

[79] *Sutton v. United States*, 988 A.2d 478, 482 (D.C. 2010).

The conspiracy and obstruction of justice charges required the government to prove, in essence, that Jenkins plotted to prevent Evans from assisting the police and testifying with respect to the Columbia Road shootings, and that Jenkins killed Evans to accomplish that goal. The jury had ample evidence to find the government had met its burden of proof. To recapitulate, the evidence showed that Evans in fact had been cooperating with the investigation of the shootings, that this was no secret, and that Jenkins had pulled a gun on Evans and accused him of "snitching" on Israel. Moreover, the jury reasonably could understand Jenkins's recorded phone conversations with Israel to reveal that Jenkins and Israel had plotted to prevent Evans from being a witness against Israel. The evidence further proved that Jenkins was the last person seen with Evans, that they went off together just a few hours before Evans was murdered, and that his murderer left the scene of the crime in a vehicle that looked like Jenkins's SUV. Forensic analysis of the tire tracks left at the scene of the murder added to the likelihood that Jenkins's vehicle was involved. While the evidence was circumstantial, and "direct or physical evidence" (as Jenkins puts it) was lacking, that did not render the government's proof insufficient; nor was the government obliged to disprove every possible theory of innocence that Jenkins put forward.[80] Finally, the fact that

---

[80] *Smith v. United States*, 809 A.2d 1216, 1221 (D.C. 2002).

the jury hung with respect to the first-degree murder charge does not impeach his conviction for obstruction, even assuming the two outcomes are not easily reconciled.[81]

We do not find sufficient evidence to uphold Jenkins's conviction for carrying a pistol without a license,[82] however. The government argues that the evidence permitted the jury to infer that Jenkins participated in the armed murder of Evans and therefore carried a firearm at that time, and it is uncontested that Jenkins was unlicensed, but that does not end the inquiry. To convict Jenkins of CPWL, there needed to be proof that the firearm Jenkins carried was a "pistol," a statutorily-defined term meaning that the firearm's barrel had to be less than 12 inches in length.[83] The government presented no evidence that the firearm was a pistol; it was not recovered, no witness professed to have seen it, and no forensic evidence shed light on the nature of the firearm used to kill Evans. Consequently, Jenkins's conviction for CPWL must be reversed for insufficiency of the evidence.

---

[81] *See Whitaker v. United States*, 617 A.2d 499, 503 (D.C. 1992) (noting that conviction for possession of a firearm during a crime of violence may stand even though the jury deadlocked on the predicate charge of assault with a dangerous weapon.)

[82] *See* former D.C. Code § 22-4504(a) (2001).

[83] *See* former D.C. Code § 22-4501(a) (2001).

## G. Sentencing

Lastly, Jenkins argues that the court impermissibly relied on findings unsupported by the evidence to impose a harsher sentence than would otherwise have been called for by the voluntary sentencing guidelines. Specifically, Jenkins complains of the court's findings that his offense was particularly egregious because it involved the murder of a witness, and that Evans was a particularly vulnerable victim due to his PCP addiction and because he had "given up" and was emotionally unstable.

"A judge has wide latitude when conducting a sentencing hearing, and may rely on evidence not admissible during trial," as long as such evidence is reliable.[84] If the sentence is within the statutory maximum, as it is here, it is "unreviewable except for constitutional concerns."[85] The only constitutional claim Jenkins makes is that the court, in violation of due process, made baseless assumptions and relied on mistaken information in making the aforementioned findings.[86] There was,

---

[84] *Wallace v. United States*, 936 A.2d 757, 780 (D.C. 2007) (citations omitted).

[85] *Saunders v. United States*, 975 A.2d 165, 167 (D.C. 2009); *Greene v. United States*, 571 A.2d 218, 221-22 (D.C. 1990).

[86] *See Wallace*, 936 A.2d at 780.

however, sufficient evidentiary support for each of them. As discussed above, there was ample evidence that Jenkins was involved in Evans's murder, and the jury so found in convicting him of obstruction of justice. That the jury hung on the murder count was a non-event that does not affect the validity of the judge's determination. There also was reliable evidence that Evans was addicted to PCP; notably, his friends testified that on the day of his death, Evans went off with Jenkins to buy PCP despite his fear of Jenkins. Lastly, Evans's friends and sister testified that he seemed depressed and had been saddened by the recent death of a close friend. Accordingly, we reject Jenkins's claim of error in the court's sentencing decision.

## III.

For the foregoing reasons, we reverse Israel's conviction for obstruction of justice and Jenkins's conviction for carrying a pistol without a license, and we affirm appellants' convictions on all other counts.

*So ordered*.